### UNITED STATES of America, Plaintiff–Appellee,

v.

### Deb H. BRYSON and Melvin Girton, Jr., Defendants–Appellants.

Nos. 03–2280, 03–2905.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 18, 2004.

Decided April 7, 2004.

James P. Hanlon, Donna A. Eide, Office of the United States Attorney, Indianapolis, IN, for Plaintiff–Appellee.

Kevin McShane, Indianapolis, IN, for Defendant–Appellant.

Before COFFEY, EASTERBROOK, and EVANS, Circuit Judges.

**ORDER**

Deb Barnes[1] and Melvin Girton were indicted on charges of conspiracy to commit mail fraud arising out of a mortgage fraud scheme in Indianapolis between early 1998 and May of 2001. They were accused of being part of a conspiracy in which inflated appraisals and other false information were used to obtain loans in excess of the true value of the real estate being purchased. The indictment charged Barnes and Girton with conspiracy to commit mail fraud in violation of 18 U.S.C. § 371 and three counts of mail fraud in violation of 18 U.S.C. § 1341. Barnes was also charged with 10 counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(I). Twelve other people indicted in the conspiracy pled guilty to various charges. Barnes and Girton took their chances, went to trial, and a jury convicted them on all counts. Barnes was sentenced to a term of 60 months. Girton

---

1. Deb Barnes was indicted under the name "Deb Hallum Bryson a/k/a Deb H.B. Barnes." She filed an appeal using the name Deb H. Bryson. Her current (married) name and the name used most often to identify her at the trial was Deb Barnes. We will refer to her in this opinion as Deb Barnes.

received a 44–month sentence. They now appeal, raising a number of issues. We begin with the facts, which at this stage of the proceedings we must present in the light most favorable to the verdict.

The mortgage fraud scheme was large and complex. It began with Tim Fagan, a former drug dealer turned real estate investor. Fagan began buying real estate through Paul Dailey's mortgage company, Platinum Mortgage. Fagan obtained loans on residences in excess of the true value of the properties by using inflated appraisals and falsified income documentation. He obtained this misleading documentation from Kevin Killebrew, an accountant who created W–2s, check stubs, and tax returns which incorrectly showed the borrowers earned enough income to qualify for loans. Killebrew also created false invoices showing liens on the properties that needed to be paid at closing. The money that the lenders thought was being used to pay these liens went to Fagan.

Initially, Fagan used this extra money to fix up the properties. However, he quickly fell behind on the loan payments. Soon he began pocketing the extra money and defaulting on his loans.

Because Fagan defaulted, his credit became too poor to obtain any more loans in his name. He then began using people with good credit histories as straw purchasers to buy more properties' and get cash from more loans. He shared the excess loan proceeds with the straw purchasers, who also defaulted on the loans. Fagan received several hundred thousand dollars in the scheme.

Fagan needed inflated appraisals in order for this scheme to work. He would tell appraisers the value at which he wanted the properties appraised. Girton was one of the people to provide him with these inflated appraisals. To order these appraisals, Fagan testified that "Basically, I would tell [Girton] the address of the property that I need [sic], and tell him the type of value I need from that property...."

Appraisals follow a standard format and are supposed to include certain information. One piece of information is data from the multiple listing service (MLS), which lists properties that are for sale through a real estate agent. The MLS listing includes the asking price and a description of the property and is available to all real estate agents. The listing price and any recent sales are key factors an appraiser uses to determine the fair market value of a property. Real estate appraisers are required to state on an appraisal whether, according to the MLS, the property is currently for sale or has been listed or sold in the past 12 months.

The properties Girton appraised were listed in the MLS at a price significantly lower than the value at which Girton appraised the property. Girton's appraisals were between 50 and 223 percent higher than the MLS price. Instead of explaining why he appraised the property substantially higher than the MLS listing price, Girton either falsely stated on the appraisals that the properties had not been listed in the MLS in the past 12 months or did not answer the question. Girton signed each appraisal report certifying that the information in it was accurate. Also, Fagan had to remind Girton to take a photograph of each property that did not include the for-sale sign in the yard, establishing that Girton knew the property was listed for sale and therefore in the MLS.

After the inflated appraisals and falsified loan applications were completed, Platinum Mortgage would mail the loan application packages via private commercial interstate carrier (such as FedEx) to one of several lenders. After loan approval, Fagan or other Platinum Mortgage em-

ployees would designate at which title company the closing would take place. Title companies were selected based upon their willingness to let Fagan or Platinum Mortgage control the closing, which was essential to keeping the seller and lender in the dark about what was really happening.

In order to complete the deception and obtain the loan money, several things needed to occur at these closings. A HUD–1 settlement statement is prepared for each closing showing the selling price of the property. In order to get the extra money from the lender, Fagan needed two HUD statements: one for the seller showing the true selling price, and one for the lender showing an inflated selling price.

Fagan used Barnes, a closing agent at Meridian Title, to prepare these "double HUDs." He gave her instructions on how to close the loans he obtained through the straw purchasers. At each closing he told her to write checks contrary to the lender's instructions, including writing checks to the straw purchasers (the borrowers) and to fictitious companies. The HUDs returned to the lender via FedEx did not disclose that Barnes wrote checks to the borrower. Instead, the HUDs falsely stated that the borrower provided a down payment and that most of the loan funds were disbursed to the seller. The HUDs sent to the lender also reflected a false purchase price far above the true purchase price. For example, in one instance the HUD sent to the lender reflected a $96,000 purchase price, whereas the purchase price reflected on the seller's HUD was $44,500.

Barnes also prepared disbursement ledgers for these closings. In the closing we just mentioned, the disbursement ledger shows that the only money collected and disbursed by Barnes was the lender's money—$81,129.00. However, the borrower received $28,798.13; this was not reported on either HUD. The down payment reflected on the HUD was never collected or disbursed. Barnes signed both settlement statements certifying "The HUD–1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement." Barnes did not perform these duties gratis; she received $200 under the table from Fagan for each double-HUD closing she did.

Not satisfied with the $200 she was receiving for each closing, Barnes devised another way to make money from each transaction. Using the fraudulent loan closing proceeds, Barnes wrote checks drawn on her employer's escrow account to Hobert Montgomery, Mark Egger, and KC Mechanical, a company owned by Kristina Kirby, who worked with Barnes at Meridian Title. Montgomery, Kirby, and Egger were recruited by Barnes and her husband, John Barnes, to cash these checks and split the proceeds with them; they were told they needed to cash the checks so Barnes could collect bonuses her employer would not pay her directly. Fagan was not aware that Barnes was writing these checks or that she was getting money from the fraudulently obtained loan proceeds in addition to the $200 he gave her. The money laundering charges of which Barnes was convicted arise out of the checks she wrote on the Meridian Title escrow account to Montgomery, Kirby, and Egger, the negotiation of those checks, and the return of some of those proceeds to Barnes.

At about the same time Fagan was closing fraudulent loans through Barnes at Meridian Title, the pattern of bank deposits into Barnes' personal bank account changed, as did her personal spending habits. Barnes' bank account records established that during this time she deposit-

ed cash totaling several thousand dollars into her personal bank account in addition to her regular payroll deposits. Barnes also began spending about a thousand dollars a month on various television home shopping networks, paying for the purchases with her bank debit card.

At trial, Barnes testified on her own behalf. She admitted that she signed both of the HUDs for each closing certifying that they were true. She also admitted that she signed the disbursement checks. She maintained, however, that she did not think there was anything wrong with what she did. She contended that her assistant prepared the checks even though the assistant did not have the authority to sign the checks and was not a closing agent. She said she was so busy conducting closings that she did not notice the checks were made out to KC Mechanical. She explained that the checks made payable to Montgomery were for work her husband had done on Fagan's properties, and that they were made payable to Montgomery so that her husband could hide the income from his former wife.

■ Barnes' first issue on appeal is that the evidence of her home shopping network expenditures during the time she was closing fraudulent loans was unduly prejudicial and misled the jury, in violation of Federal Rule of Evidence 403. She also maintains that it was evidence of other bad acts, inadmissible under Rule 404(b). She asserts that her television shopping was construed as a shopping addiction, akin to alcoholism or drug addiction, in order to prejudice the jury against her. We review a district court's evidentiary rulings at trial for abuse of discretion. *United States v. Hughes,* 970 F.2d 227, 232 (7th Cir.1992). A district court's evidentiary rulings will only be reversed where the record contains no evidence on which the district court could rationally have based the rul-

ing. *United States v. Conley,* 291 F.3d 464, 472 (7th Cir.2002).

Barnes has mischaracterized the evidence admitted at trial. The government did not characterize the spending as pathological, habitual, or impulsive. The evidence was instead used to corroborate the testimony of other government witnesses that Barnes was taking kickbacks from the fraudulent loans during the period she began spending a thousand dollars a month on television shopping networks.

Evidence is relevant when it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Barnes' shopping habits were relevant because it made it more probable she was taking kickbacks. "A sudden increase in cash expenditures or other unusual circumstances in the defendant's handling of money may ... be ... probative" to support proof of guilt in larceny or similar crimes involving a motive of enrichment. *United States v. Crisp,* 435 F.2d 354, 360 (7th Cir.1970). The district judge, who is "much closer to [the] pulse of [a] trial," has broad discretion in weighing the relevance of evidence against the danger of unfair prejudice. *United States v. Juarez,* 561 F.2d 65, 66 (7th Cir.1977). The judge here did not abuse his discretion in admitting this evidence.

■ Barnes next contends that the evidence was insufficient to convict her of money laundering. The money laundering counts involved Barnes writing checks drawn from the fraudulently obtained loan money in her employer's escrow accounts. She drew up phony invoices, made these checks out to her friends, got them to cash the checks, and split the money with them. To be guilty of money laundering, one must conduct a financial transaction which involves the proceeds of specified unlawful

activity "knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]" 18 U.S.C. § 1956(a)(1)(B)(I).

Barnes claims that she was guilty of simple theft, not money laundering, because she hatched her own, separate plan to divert funds from the lenders' proceeds. The theft scheme, she goes on, would have been successful even if the real estate transactions were all legitimate.

This claim ignores the results of the trial. Barnes was convicted of conspiracy to commit mail fraud and mail fraud. For three of the money laundering counts, the alleged specified unlawful activity proceeds were from the mail fraud charges of which Barnes was convicted. She was convicted of the "specified unlawful activity" as required in the definition of money laundering.

For the other three money laundering counts, the unlawful activity alleged in each was a specific fraudulent loan. Barnes was the closing agent for each loan and, as we said, she prepared two sets of HUD statements for each transaction. The entire loan file was admitted, including both sets of HUDs prepared and signed by Barnes. Fagan testified that Barnes closed more than 20 fraudulent loans for him. Fagan paid Barnes to prepare two sets of HUDs and to follow his closing instructions instead of the lender's closing instructions. Barnes signed and distributed checks from the fraudulent loan proceeds to her friends to cash and return part of the money to her for her "bonuses." She laundered part of the fraudulently obtained money to conceal that she was getting an extra cut in addition to what she was getting under the table from Fagan and Garner. Just be-

cause Barnes did not initiate the scheme does not vitiate her guilt.

█ Barnes also argues that the district judge abused his discretion by refusing to allow a downward departure outside of the sentencing guidelines based on her family circumstances. However, discretionary decisions not to depart are not reviewable. *United States v. Egwaoje*, 335 F.3d 579, 588 (7th Cir.2003). There is also a strong presumption that district judges know and understand the law. *Egwaoje* at 588.

The district judge clearly understood he had the authority to depart but decided not to do so.

Now, the departure on the basis of family hardship, your counsel is correct, the Guidelines discourage that kind of a departure and there has to be some set of circumstances that is extremely unusual. And it is also true that it depends sometimes on where we are in the Guidelines to begin with as to what kind of hardship is being placed on the family. In other words, what kind of activity got us to the—to this point in the Guidelines. And as I balance the harm caused to this community by the activities of which the jury found you guilty, the more harm, the less concern for the family.

In this case I recognize this to be very difficult for this family. There isn't any question that you have a family of children of such an age and in such circumstances that it will be difficult for them to do without you. And, on the other hand, the obvious disregard for everybody else's family that was involved in this crime, and the disregard for families that live in these neighborhoods, and the total disregard for the financial institutions that were defrauded by this activity, outweigh the difficulty in the balance that this family is going to suffer. I don't find this to be the kind of extraor-

dinary family hardship that weights to the point where I would depart. And so I will not depart for any of those two reasons.

Even if the judge's decision were reviewable, departures from the guidelines based on family circumstances are discouraged. U.S.S.G. § 5H1.6; *United States v. Carter,* 122 F.3d 469, 474 (7th Cir.1997) ("[F]amily considerations ... warrant a departure only in the extraordinary and unusual case."). Courts have properly denied downward departures even in sympathetic situations, such as when both parents were going to be incarcerated or where the defendant is a single mother with an infant. *See United States v. Bieri,* 21 F.3d 811 (8th Cir.1994), and *United States v. Johnson,* 908 F.2d 396 (8th Cir.1990).

The information presented to the trial court by Barnes' expert showed that one of her children suffers from ADHD and that severe hardship would result from her imprisonment. However, "[i]mprisoning the mother of a child for even a short period of time is bound to be a wrenching experience for the child, but the guidelines do not contemplate a discount for parents of children." *United States v. Stefonek,* 179 F.3d 1030, 1038 (7th Cir.1999). Undisputed evidence that her children's problems will be aggravated by her incarceration does not justify a departure. *Stefonek,* at 1038. Also, the children have her husband and their fathers to look after them. Where a defendant has a spouse or other relative to look after her children, "[her] case for a downward departure [becomes] less compelling." *United States v. Jaderany,* 221 F.3d 989, 996 (7th Cir.2000). The district judge properly concluded that a downward departure was not warranted, and his decision is not reviewable. And as we have just noted, the decision not to depart would not have been an abuse of discretion even if the merits were considered.

Girton's first argument is that the district judge abused his discretion when he approved funds for Girton's expert witness just one month prior to trial and then denied a continuance to give the expert more time to prepare. Girton first filed a motion seeking funds for an expert witness approximately 8 months prior to trial. This motion was approved. In November 2002, 3 months before the trial was scheduled to begin, Girton filed a motion requesting additional funds for the expert. The district judge instructed Girton to seek a flat fee from the expert rather than continue hourly billing. On December 16 the expert quit. Girton did not find another expert until January 7, 2003. On January 13, 2003, the judge granted Girton's motion for $13,500 in fees for this new expert. This left the trial date less than a month away. Girton then filed three separate motions for a continuance and all were denied.

To prevail, Girton must establish that the district judge acted arbitrarily and caused him actual prejudice as a result of the denial of a continuance. *United States v. Mabrook,* 301 F.3d 503, 507 (7th Cir. 2002). Factors relevant to our determination include (1) the amount of time available for preparation, (2) the likelihood of prejudice from denial, (3) the defendant's role in shortening the effective preparation time, (4) the degree of complexity of the case, (5) the availability of discovery from the prosecution, (6) the likelihood the continuance would satisfy the movant's needs, and (7) the inconvenience to the court. *United States v. Avery,* 208 F.3d 597, 602 (7th Cir.2000).

The change in experts shortly before trial resulted in an expert witness who testified that he conducted only "limited" or "very cursory" preparation for trial. The government has not given us any evi-

dence that Girton played any role in his first expert quitting or in taking a month to find a new expert. However, Girton has failed to prove any prejudice from the denial. Girton's key defenses were incompetence and inexperience. The government's expert testified about the gross inaccuracies contained in the six key appraisals Girton performed. Instead of attacking the government's expert, Girton's expert testified about several other appraisals done by Girton that were also inaccurate. The expert presented numerous examples of mistakes in Girton's appraisals, and he did not once complain that he was ill-prepared. Girton's attorney never asked him about the government expert's opinion; only upon cross-examination did the expert state that he only gave the government's reports a "very cursory" review. Girton has failed to demonstrate how his expert's testimony would have differed given more preparation time; his expert told the story of inaccuracies in the appraisals and supported Girton's defense of incompetence. The district judge did not abuse his discretion in failing to reschedule this trial involving two defendants and multiple witnesses so close to the trial date.

█ Like Barnes, Girton also raises a Rule 404(b) issue. He argues that the district judge erred when he admitted evidence surrounding the purchase of Girton's own home, including an inflated appraisal and other fraudulent documents. The government counters that this appraisal was admitted to prove Girton's intent, knowledge, and absence of mistake in committing the crimes he was charged with, and thus falls under the exception to Rule 404(b)'s prohibition of "prior bad acts" evidence.

A district court's determination of the admissibility of evidence is treated with great deference because of the trial judge's firsthand exposure to the witnesses and the evidence as a whole, and because of his familiarity with the case and ability to gauge the likely impact of the evidence in the context of the entire proceedings. Because of the special deference we give to the trial judge's evidentiary rulings, we will not reverse unless the record contains no evidence on which the judge rationally could have based his decision. *See Okai v. Verfuth*, 275 F.3d 606, 610 (7th Cir.2001).

District courts apply a four-part test to determine whether evidence of a defendant's prior bad acts is admissible. To comport with the requirements of the Rule 404(b) exception, the evidence must: (1) be relevant to a matter in issue other than the defendant's propensity to commit the crime charged; (2) be similar and close enough in time to be relevant to the matter in issue; (3) be sufficient to support a jury finding that the defendant committed the similar act; and (4) have a probative value that is not substantially outweighed by the danger of unfair prejudice. *United States v. Conley*, 291 F.3d 464, 472 (7th Cir.2002) (quoting *United States v. Moore*, 115 F.3d 1348, 1354 (7th Cir.1997)).

The district judge evaluated the government's evidence according to this test before ruling on its admissibility:

> The file on the [transaction to purchase his own residence] reveals that the transaction took place within the time frame of the charged conspiracy, thereby satisfying the temporal element of 404(b) evidence. The file also reveals a similar scheme to that with which he is charged, that is, it contains fraudulent documents and an inflated appraisal. The contents of the file, coupled with the proffered testimony, do meet the standard of proof under 404(b). The defense raised in the opening statement of defendant of lack of intent makes this file

non-prejudicial in the 404(b) sense and is relevant to the issue of intent.

Girton contends that the only connection between the fraud he committed to obtain his home loan and the fraud he was charged with is that both acts were intended to benefit him. Just because he broke the law in obtaining his personal residence does not prove his intent to defraud here, he reasons; it only proves that he has a propensity to commit crime, and the evidence should thus have been excluded under Rule 404(b).

Girton's argument is disingenuous. The home loan evidence included a fake land contract in the same form as one used by two members of the conspiracy charged in the indictment, false statements and documentation regarding his income, and an appraisal report with identical omissions as on the appraisals involved in the indictment. Girton's theory of defense was essentially that it was all a mistake—he simply lacked the proper training, didn't know how to fill out the appraisal forms correctly, and the government misconstrued his mistakes as fraudulent conduct. The personal home loan evidence was directly relevant to a matter Girton placed at issue— whether or not he intended to commit fraud and knew what he was doing.

The other elements of the test for admissibility of 404(b) evidence are also met. Girton prepared the fraudulent documents to obtain his home loan at the same time he was preparing the appraisals he was indicted for, satisfying, as the district court found, the temporal requirement. A jury could easily find by a preponderance of the evidence that Girton used a fraudulent scheme to obtain the loan for his residence.

Finally, the danger of unfair prejudice did not substantially outweigh the probative value of the evidence. Because "all probative evidence is prejudicial to the party against whom it is introduced," the salient inquiry under Rule 404(b) is whether the challenged evidence caused *unfair* prejudice. *United States v. Coleman,* 179 F.3d 1056, 1062 (7th Cir.1999) (quoting *United States v. Adames,* 56 F.3d 737, 742 (7th Cir.1995)). "Unfair prejudice" refers to "the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *See Old Chief v. United States,* 519 U.S. 172, 180, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997). Even without this evidence, the case against Girton was substantial. The other evidence consisted of the testimony of Fagan, appraiser Brian Hersberger, and the appraisals themselves. The district judge did not abuse his discretion when he admitted this evidence because it was relevant to Girton's intent, knowledge, and lack of mistake, and thus fell within the exception to prior bad acts evidence of Rule 404(b).

■ Girton also contends that the district judge abused his discretion by excluding evidence of a post-indictment appraisal that Girton did; the appraisal supposedly suffered from the same types of mistakes as the appraisals he was indicted for and was offered to bolster his defense of mistake. The judge also excluded two witnesses, one of whom would have testified that Girton was hired to conduct the appraisal, and the other was a review appraiser who would have testified the appraisal suffered from similar infirmities as the appraisals he was indicted for. The judge excluded the evidence as irrelevant and outside the time frame covered by the indictment. Girton claims this evidence would have "closed the loop" and proven that he acted similarly prior to, during, and after the time alleged in the indictment and was relevant to his lack of intent. Girton argues that he was thus deprived of

presenting a defense of innocence and should be granted a new trial.

At trial, Girton presented ample evidence of his lack of criminal intent through his expert witness. His witness testified about several Girton appraisals during the time frame covered by the indictment, explaining that they contained numerous errors. The additional appraisals would have been cumulative; furthermore, they were not completed during the relevant time frame. Girton was not deprived of the opportunity to present a defense.

■ Girton also challenges the district judge's finding of the amount of loss attributable to him under relevant conduct principles. The district judge determined the loss to be between $500,000 and $700,000, but Girton believes this figure is inflated and resulted in an improper increase of his base offense level pursuant to U.S.S.G. § 2F1.1. We review the district judge's relevant conduct loss calculation for clear error. *United States v. Gramer*, 309 F.3d 972, 974 (7th Cir.2002).

The district judge determined the loss level by totaling the amount of fraudulent loan proceeds obtained by using Girton's inflated appraisals and subtracting the fair market value for those properties (the fair market value being collateral for the loans). We see no error in the procedure employed by the district judge to determine the amount of loss for guideline purposes. A district judge's determination need not be precise, but just a reasonable calculation. U.S.S.G. § 2F1.1, cmt. n. 9 (2000); *United States v. Ross,* 77 F.3d 1525, 1552 (7th Cir.1996); *United States v. Narvaez,* 995 F.2d 759, 764 (7th Cir.1993). Instead of hiring an expert to conduct costly appraisals of all the properties, using the actual sales price—with an actual instead of hypothetical seller—was a reasonable proxy for fair market value.

■ Girton also contends that he should only be liable for the amount of loss attributable to the appraisals that were part of his conviction. At trial he was convicted on counts involving three properties, but at sentencing the government presented evidence regarding an additional 14 properties. Testimony at sentencing established that the additional loans were part of the same scheme charged in the indictment. Girton claims an expert was needed to testify whether the additional appraisals were fraudulent.

The judge noted that Girton's sentencing memorandum conceded that at least eight appraisals should be considered, bringing the loss to at least $359,500. The judge stated that, in determining relevant conduct, he should consider whether the other appraisals were

> a part of the same course of conduct, or common scheme or plan of the offense of conviction.... These activities must be substantially connected to each other by at least one common factor, such as common victim, common accomplices, common purpose, or similar modus operandi ... [or] part of a single episode, spree or ongoing series of offenses.

In applying these principles, the judge concluded the additional loans were within a similar time frame, involved a common scheme, involved a similar modus operandi, and involved common accomplices. There is ample evidence the additional appraisals were involved in a common scheme, and the judge's conclusions are not clearly erroneous. An expert was not necessary at sentencing to reach this determination.

The judgments of the district court as to Barnes and Girton are AFFIRMED.