2021 IL App (1st) 172811

THIRD DIVISION
May 5, 2021

No. 1-17-2811

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15 CR 11378 |
| TORREZ MOORE, | ) ) | Honorable Alfredo Maldonado, Judge Presiding |
| Defendant-Appellant. | ) | |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Presiding Justice Howse and Justice McBride concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant Torrez Moore was convicted of theft and financial institution fraud stemming from a scheme in which he attempted to obtain title to five homes in Chicago by filing fraudulent documents with the Office of the Cook County Recorder of Deeds. Before trial, defendant informed the circuit judge (now retired, and not the judge who tried the case) that he wanted to proceed *pro se*. But the circuit court never furnished defendant with the admonishments required by Illinois Supreme Court Rule 401 before it accepted defendant's waiver of his right to counsel. And the record shows that there was not substantial compliance with Rule 401. We thus reverse his convictions. We further find, contrary to defendant's claims, that the evidence was sufficient to convict him, and thus there is no double-jeopardy bar to retrial.

¶ 2                                    I. Rule 401(a)

¶ 3      We first consider defendant's argument that the circuit court failed to admonish him in accordance with Illinois Supreme Court Rule 401(a) (eff. July 1, 1984) before it accepted his waiver of counsel and allowed him to proceed *pro se*. We begin with the relevant background information before proceeding to our analysis.

¶ 4                                    A. Background

¶ 5      In July 2015, a grand jury returned a 21-count indictment against defendant charging him, among other crimes, with two counts of theft of greater than $1 million (Class X felonies), one count of financial institution fraud (Class X), and three counts of financial criminal enterprise (Class 1 felony). See 720 ILCS 5/16-1(a)(1)(A) (West 2014); (720 ILCS 5/17-10.6(c)(2) (West 2014). The gist of the indictment was that defendant, "in furtherance of a single intention and design," attempted to obtain title to five parcels of property in Chicago—10821 South Wood Street; 10929 South Esmond Street; 4200 West Rosemont Avenue; 9022 South Indiana Avenue; and 9148 South Greenwood Avenue—by filing "fraudulent adverse possession documents with the Cook County Recorder of Deeds Office.

¶ 6      The sentencing range for a Class X felony is 6 to 30 years' incarceration. 730 ILCS 5/5-4.5-25(a) (West 2012). A sentence for a Class 1 felony ranges from 4 to 15 years in prison. 730 ILCS 5/5-4.5-30(a) (West 2012).

¶ 7      Defendant was arraigned on July 28, 2015. At that time, he accepted appointment of the Public Defender of Cook County. Another individual named David Farr, who was charged under a separate indictment, but who was targeted and arrested during the same investigation, appeared at that time as well and was likewise appointed counsel. See *People v. Farr*, 2020 IL App (1st) 171514-U, ¶ 35 (unpublished order under Illinois Supreme Court Rule 23).

¶ 8    Defendant next appeared before the court on September 9, 2015. At that hearing, David Farr was once again present as well. Both defendant and Farr were represented by counsel at the September 9 hearing. (As noted earlier, the judge at this hearing later retired, and a different judge presided over the trial.)

¶ 9    During the hearing, the court addressed Farr and defendant separately, beginning with Farr. Farr's attorney informed the court that Farr asked him to withdraw and wished to represent himself. The following colloquy took place between the court, Farr, and the State:

> "THE COURT: You choose to represent yourself in this matter.
>
> [FARR]: Yes, sir. Actually, I want to put something on the record as well.
>
> THE COURT: Here let me just do one step at a time.
>
> [FARR]: Yes, sir.
>
> THE COURT: What Class am I dealing with here?
>
> MR. JAKALSKI [Assistant State's Attorney]: Class X.
>
> THE COURT: Okay. You're charged with the offense should you be found guilty the minimum is six 6 years, the maximum is 30, and it is not probationable so it's a penitentiary case so I don't know what the facts of the case are, I apologize.
>
> MR. FARR: Yes.
>
> THE COURT: I need to advise that if you represent yourself in these particular matters I would hold you to the same degree as I would hold any attorney that is in front of me representing—
>
> [FARR]: I object to that due to *Haines v. Kerns* that I am not an attorney and you cannot keep to the same standards of that of an attorney. That is case law as well.

3

THE COURT: Well, I disagree with that case, and I'm tell [*sic*] you I'm following the law of the State of Illinois when I indicate that to you there's no additional advantages to the individual that represents himself in the case.

[FARR]: Okay we'll [*sic*] I'm not representing myself *pro se*, sir. I'm representing myself *in propria pur suri juris*.

THE COURT: I understand you representing yourself in this. I recognize because I have been doing this a long time. Lots of people have lots of different ideas, and I respect that.

[FARR]: Yes.

\* \* \*

THE COURT: Okay. I need to go through a series of questions with you, are representing yourself once I determine that you can represent yourself.

[FARR]: Yes.

THE COURT: Whatever you choose to do is fine okay. Okay how old are you?

[FARR]: If I answer these questions, am I still putting my [*sic*] under a certain type jurisdiction of the court by answering all of your questions?

THE COURT: You are under the jurisdiction of this court.

[FARR]: Is the jurisdiction assumed, sir, or is it by threat, duress, and coercion?

THE COURT: No it's assumed. You are physically in front of me. I have jurisdiction.

[FARR]: But it also is by fact. Jurisdiction has been discovered by threat, duress, and coercion because I am in one of the uniforms of the State in which I do not belong. I belong to the United States, the United States of Republic, which is a different

4

government, and I'm also according to my birth certificate which is authenticated, and which is authenticated in a seat of government that says full faith and credit, sir. That means that my jurisdiction is different from the jurisdiction of this Court, and since my jurisdiction is from a different jurisdiction, the State now has the right to negotiate my affairs, and I have the right to negotiate my affairs the way I see fit. However, those affairs have been violated due to those jurisdictions that I have just spoken of, and those two elements of jurisdiction that this Court have never proven by way of an affidavit those jurisdictions are persona [*sic*] jurisdiction subject matter jurisdiction and neither one of those jurisdictions have been proved by what [*sic*] signature at all. However, I'm at this point to negotiate the terms of the contract which I've already sent to secretary— not the Secretary of State, but the Attorney General of this State giving them a—an analysis or a violation of fees that they ever should retain for any set reason that was not pertaining to a crime of that nature; however, today, sir—

THE COURT: Let me just interrupt you for a second, please.

[FARR]: Okay go ahead.

THE COURT: It appears that you have done vast research on this case, I will allow you to represent yourself."

¶ 10    Immediately after addressing Farr, the court addressed defendant:

"THE COURT: Okay, Mr. Moore.

THE DEFENDANT: Yes, sir. I have a Motion here that I like to file with the court to withdraw the guilty plea and to terminate the counsel if I may because I need it stamped and filed.

THE COURT: Anything from you?

MR. BROWN [Assistant Public Defender]: Judge, for the record, while I was representing him there was never [a] plea of guilty entered.

THE DEFENDANT: Oh, yeah, it was a not guilty plea entered the last time I was here. I also asked the—

THE COURT: You said guilty plea, I believe you said guilty plea—

THE DEFENDANT: Not guilty, I'm sorry.

THE COURT: Okay.

THE DEFENDANT: Not guilty. Here's a copy of it right here. I also want to add, Judge, that I would like a change of venue to federal court plus I believe that it was civil in nature what I was doing. It was not criminal. I got a Motion for that also, but I believe I need the petition because I needed two affidavits with that petition in order to record it, and I only got one. I may need some copies, but also I want to change it to a federal jurisdiction for the record, Judge. Those two are not the same, are they?

THE COURT: I haven't looked at it yet. Just a second.

THE DEFENDANT: Uh-huh. I also want to let you know, Judge, that I'm waiving the benefit, but if I can have help with counsel or something assistance or standby counsel I'm not waiving that.

THE COURT: Well, I'll indicate there will be no standby counsel appointed in your case. There will be no standby counsel appointed in your case either.

THE DEFENDANT: Okay.

THE COURT: If you choose to go pro se that's the way it is going to be.

THE DEFENDANT: Yes, sir.

THE COURT: Because otherwise you place an attorney, the standby attorney in jeopardy.

THE DEFENDANT: I understand. And I got the affidavit for change of venue.

THE COURT: I just have one copy of this. The question was whether I had two.

THE DEFENDANT: This is for change of venue. You need another one of those.

THE COURT: No. Have you provided the State with a copy of these, if not I'll give them the originals and they will make copies.

THE DEFENDANT: That will be appreciated.

MR. JAKALSKI: Acknowledge receipt.

THE DEFENDANT: I'll also need my Motion to terminate counsel as well.

THE COURT: I've granted the Motion."

¶ 11                                B. Analysis

¶ 12    Defendant claims that the admonishments or lack thereof prevented him from validly waiving counsel under Rule 401(a). He did not preserve this issue for appeal, as he failed to raise it in his post-trial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). But we may review it for plain error under the second prong of the plain-error doctrine, as the failure to ensure a knowing and intelligent waiver of counsel is "a plain and serious error." *People v. Vernon*, 396 Ill. App. 3d 145, 150 (2009); *accord People v. Brzowski*, 2015 IL App (3d) 120376, ¶ 42 (collecting cases). Our first step is determining whether any error occurred in the first instance. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 13    A defendant has the right to counsel at all critical stages of a criminal prosecution. *People v. Burton*, 184 Ill. 2d 1, 22 (1998); see U.S. Const., amd. VI. But "[w]hen an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits

7

associated with the right to counsel." *Faretta v. California*, 422 U.S. 806, 835 (1975). Thus, "[a]lthough a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' " *Id*. (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)).

¶ 14    For that reason, a court may not accept a purported waiver of the right to counsel unless the waiver was made " 'knowingly and intelligently.' " *Id*. (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464-65 (1938)); see *People v. Haynes*, 174 Ill. 2d 204, 235 (1996) (waivers must be "voluntary, knowing and intelligent"). It was against that backdrop that Rule 401 was enacted. See *People v. Campbell,* 224 Ill. 2d 80, 84 (2006).

¶ 15    Rule 401(a) states:

> "Any waiver of counsel shall be in open court. The court shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:
>
> (1) the nature of the charge;
>
> (2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and
>
> (3) that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court." Ill. S. Ct. R. 401(a) (eff. July 1, 1984).

¶ 16    The plain language of the rule requires that the court "address[] the defendant personally in open court" and do two things—"inform[] him of and determine[e] that he understands" the three listed items. *Id.*

¶ 17    That is the predominant problem here. The trial court admonished Mr. Farr—adequately so in this court's view in a previous unpublished order we entered. See *Farr*, 2020 IL App (1st) 171514-U, ¶ 35. But the trial court did not personally address defendant, nor could it possibly be claimed that the trial court determined that defendant understood the admonishments. We do not see how we could say that the court's Rule 401(a) admonishments to another individual sufficed as admonishments to defendant.

¶ 18    We would have to assume far too much if we did so. We would have to assume, for one thing, that defendant was paying close attention to everything the trial court said to Mr. Farr about waiving counsel. Maybe defendant was listening with rapt attention. Or maybe he was flipping through his papers, preparing for his own upcoming moment with the court, where he planned to present several motions *pro se*. We cannot assume that defendant heard that entire exchange—nor does Rule 401(a) allow us to do so, else it would not require the court to "address[] the defendant personally." Ill. S. Ct. R. 401(a) (eff. July 1, 1984).

¶ 19    We would also have to assume that defendant *understood* everything the trial court told Farr. The rule, as noted, requires not only that the trial court provide the information to a defendant, but that the trial court ensure the defendant's *understanding* of that information. That much obviously did not occur here.

¶ 20    We would also have to assume that defendant and Farr had compared notes, so to speak, and understood that they were charged with the same crimes. True, they were targets of the same investigation and in some senses of the word might be considered co-defendants (though in fact

they were not; they were indicted under separate case numbers and tried separately). Regardless of their statuses vis-à-vis one another, we cannot assume that defendant knew the crimes with which Farr was charged. Consider that Rule 401(a)(1) contemplates that a defendant may not fully appreciate the nature of the charges against *himself* and thus requires that the trial court inform him accordingly (and ensure he understands). So we cannot imagine why Rule 401(a) would allow us to assume a defendant is aware of the charges against *someone else*. Thus, even if defendant fully understood the charges against and potential sentences for Farr, we cannot presume that defendant appreciated that what the trial court said to Farr applied equally to him as well. We do not see how Rule 401 allows us to take that leap.

¶ 21    And even if we could assume that much—and we surely cannot—as Rule 401(a)(2) itself recognizes, the length of sentences depends not only on the crimes committed but often on the criminal history of a defendant, which is why the rule requires, in informing the defendant of the maximum and minimum sentences, that the court account for "prior convictions" of the defendant. *Id*. We cannot assume that defendant knew how his own criminal history might compare to that of Farr, such that he would know that the same sentences applied to Farr and to him equally. As judges, we may know that a Class X offense contains the maximum penalty for the crimes charged here, regardless of criminal history, but we cannot possibly assume that defendant knew as much.

¶ 22    We fully appreciate that strict compliance with Rule 401(a) is not the standard, that substantial compliance suffices. *People v. Wright*, 2017 IL 119561, ¶ 41; *Haynes*, 174 Ill. 2d at 236; see *People v. Maxey*, 2018 IL App (1st) 130698-B, ¶ 41 ("To ensure a valid waiver of counsel, substantial compliance with Rule 401(a) is required."). With that in mind, the State makes several arguments in favor of substantial compliance, but we cannot accept them.

¶ 23 The State claims that defendant understood the nature of the charges against him because he was given a copy of the indictment. The record appears to reflect that defendant's counsel (before defendant waived counsel) was given a copy of the indictment on July 31, 2015, so the State may be entitled to that inference. And we would agree that defendant's filings and statements to the court indicated his appreciation of his constitutional right to counsel.

¶ 24 The record also appears to reflect relatively clearly that defendant was dead-set on self-representation. True, he asked for stand-by counsel, but he had very clear notions that the court had no jurisdiction over him, and he seemed extremely reluctant to be represented by a lawyer he viewed as being an arm of the state—as well as the notion that, by accepting a lawyer, he was somehow acceding to the court's jurisdiction.

¶ 25 The State also argues that defendant had sufficient knowledge of the maximum and minimum sentences he faced. That is true first, it says, because *Farr* was given that information, which we do not accept as sufficient. And second, because as the litigation ensued, defendant was trying to get his case transferred to the veterans' court for alternative adjudication (see 730 ILCS 167/1 *et seq.* (West 2014)) and was under the impression that the charges against him had to allow for probation; he indicated that he understood his charges were "nonprobationable," and the State mentioned at several hearings that he was charged with Class X offenses and a nonprobationable Class 1 offense.

¶ 26 Finally, the State argues that defendant had a mature understanding of the law and thus should be presumed to have understood the information he was never given pursuant to Rule 401(a). See *Maxey*, 2018 IL App (1st) 130698-B, ¶ 42 (substantial compliance may be found if defendant possesses "a degree of knowledge or sophistication that excuses the lack of admonition.' " (quoting *People v. Black*, 2011 IL App (5th) 080089, ¶ 20)).

¶ 27     We still cannot find even substantial compliance. For one thing, the record does not reflect that defendant was ever told anything about the potential sentence he faced. Perhaps lawyers and judges know that a "Class X" felony mandates a sentence of 6 to 30 years, but again, there is no particular reason why defendant would know that. His mention of a probationable sentence indicates that he understood he was facing *some* prison time, true, but nothing about 6 to 30 years.

¶ 28     The State is correct that defendant indicated to the trial court that he had recently become interested in the law and, indeed, filed several motions on his own behalf. His legal arguments claimed, among other things, that the trial court lacked jurisdiction over him because he was not a citizen of the United States of America but rather a citizen of the United States Republic (at other times claiming to be a citizen of the "People's Republic of Illinois"); that he was entitled to a "change of venue" to federal court; that the court should decline jurisdiction because the record showed no "verified complaint" or "*corpus delecti*."

¶ 29     Defendant also wrote that his motion to dismiss should be construed liberally because he was *pro se*, citing decisions from federal courts in New Jersey and the Eleventh Circuit. He claimed the State lacked "standing" to indict him. "Without standing," he explained, "anyone can sue anyone else for anything." He argued the State had no jurisdiction to prosecute him because his "accuser" was not identified. He summarized his written motion to dismiss as follows:

> "Corpus Juris Secundum assumes court will operate in a lawful manner. If the accused makes this assumption, he may learn, to his detriment through experience, that certain question[s] of law, including the question of personal jurisdiction, may never be raised and address[ed], especially when the accused is represented by the bar."

¶ 30    Suffice it to say, as vigorous and emphatic as defendant may have been in trying to defend himself, we should be careful in reading too much into his legal knowledge.

¶ 31    There must be limits to the notion of "substantial compliance." We step back and emphasize that defendant was *never* given any admonishments whatsoever. Yes, we can comb the record for isolated comments after defendant waived counsel, as the State does, and try to scrap together bits and pieces to construct a case that defendant knew all three items of information at some point before trial—the nature of the charges, the maximum and minimum term of years he faced, and his right to counsel—but then what is left of Rule 401? Nothing, essentially.

¶ 32    In many instances, courts have excused discrepancies or less-than-perfect admonishments when the court has determined that the record overall demonstrates a knowing and intelligent waiver of counsel. See, *e.g.*, *Wright*, 2017 IL 119561, ¶ 41; *Haynes*, 174 Ill. 2d at 236; *Maxey*, 2018 IL App (1st) 130698-B, ¶ 41. But we have been cited no cases, nor are we aware of any, where the court found substantial compliance with Rule 401(a) when *no admonishments whatsoever* were given.

¶ 33    That is a bridge we should not cross. Most, if not all defendants representing themselves will eventually figure out, one way or another, the three items listed in Rule 401(a). They will eventually learn the nature of the charges. Sooner or later, they will probably come to know the term of years they face if convicted. If some record evidence of that is enough, no matter how stray or random or fleeting, and even if it comes months or *years* later, then there is no point in pretending that Rule 401(a) matters. There would be no need to require the trial court to personally address the defendant and ensure he understands the requisite information; we will just scour the record, at any point in time before trial, to seize on some hint that he somehow, in

some way, managed to compile this information. Maybe we can find a hearing where the State uttered the words "Class X"—boom, now we can assume a *pro se* defendant knew that he was facing a possible term of 6 to 30 years. Did he ever get handed the indictment? Of course, so there—he must appreciate the nature of the charges. Who needs a supreme court rule?

¶ 34    And that is to say nothing of the fact that, the deeper into the case we get, the closer the defendant gets to trial, and the more prejudicial his invalid waiver of counsel. The fact that defendant here, for example, was read the charges against him two weeks before trial is no substitute for the failure of the earlier judge to so admonish him *years earlier*. Hasn't much of the damage been done by that point? The benefit of counsel is not only in trial representation but in *preparing* the case for trial over months and years. So we must be very cautious in digging up scraps and morsels about a defendant's knowledge of the Rule 401(a) information months or years after those admonishments were invalidly (or here, never) given.

¶ 35    The only case of which we are aware that involved no admonishments whatsoever is *Campbell,* 224 Ill. 2d 80. The defendant there was charged with a misdemeanor offense and was allowed to proceed *pro se* without any admonishments at all. *Id*. at 82. The supreme court found "no compliance, substantial or otherwise, with Rule 401(a)," as the trial court allowed defendant "to proceed to trial *pro se* without making any attempt to inform him of the nature of the charges, the range of possible penalties, or his right to counsel." *Id*. at 84. The court thus reversed the conviction.

¶ 36    To be sure, this case is far more complex than *Campbell*, a misdemeanor case where the defendant's trial proceeded almost immediately after he waived counsel. But we remain steadfast in our belief that if no admonishments are given whatsoever, we are unable to find compliance with Rule 401(a) of any kind, actual or substantial.

¶ 37    Because defendant proceeded *pro se* through trial without a valid waiver of counsel, his convictions must be reversed, and the cause remanded for retrial. But we must first ensure that defendant was convicted beyond a reasonable doubt (over defendant's several arguments to the contrary) so that a retrial does not constitute double jeopardy. *People v. Taylor*, 76 Ill. 2d 289, 309 (1979); *People v. Bradshaw*, 2020 IL App (3d) 180027, ¶ 43. In doing so, we may consider all evidence before the jury, regardless of whether defendant claims that any of the evidence may have been inadmissible, and regardless of any other trial errors cited by defendant. *People v. Lopez*, 229 Ill. 2d 322, 367 (2008); *People v. Olivera,* 164 Ill. 2d 382, 393 (1995).

¶ 38                                    II. Sufficiency of Evidence

¶ 39    Defendant raises several challenges to the sufficiency of the evidence. He claims that the State did not prove beyond a reasonable doubt that he acted with "in furtherance of a single intention and design," an element of each offense for which he was convicted, which allowed the State to aggregate the values of the various properties he allegedly stole and thus to charge the crimes as one offense at a Class X level (or, in the case of the continuing criminal enterprise, as a Class 1 felony). See 725 ILCS 5/111-4(c) (West 2014). Defendant further claims the State did not prove that he acted with a criminal motive, nor did the State prove that the value of the properties for which he was convicted of theft were greater than $1 million in value.

¶ 40    In light of these claims, it will be necessary to delve in detail through the evidence presented. We begin by reciting evidence that generally addressed defendant's intent and criminal enterprise, before diving more specifically into the evidence presented related to each of the five properties defendant allegedly stole.

¶ 41                                    A. Evidence at Trial

¶ 42                                    1.Tondalya Thomas

15

¶ 43    From 2009 to 2015, Tondalya Thomas worked as an investigator with the Cook County Recorder of Deeds. She was specifically trained "on recognizing documents related to the Doctrine of Adverse Possession." She explained that for adverse possession, she was trained to "look for a time that's placed in the document[]"—a reference, she elaborated, to the requirement under Illinois law that, as a precondition to acquiring title, an adverse possession claimant show either (1) "that the occupant has maintained the property for 20 years" or (2) "proof of seven years of paying property taxes." She explained that, to properly file an adverse possession claim, the claimant needed to present a court order at the time of recording.

¶ 44    When an individual filed seemingly fraudulent adverse possession documentation, the Recorder's policy was to "inform the person that's trying to file these type of documents that "[1] the[] documents do not meet the Illinois statute, [2] that they are illegal, [and 3] [the filer] may want to seek *** legal advice on obtaining these type of documents, these type of properties." But during the relevant time period here, 2012 to 2014, there were no "laws in place" mandating that the Recorder's Office reject fraudulent filings, "[s]o any document, whether it was known to be illegal or legal, we had to accept." (That apparently changed in 2015 an amendment to Illinois law.). Thus, until the 2015 law change, if a filer insisted on filing a patently fraudulent document, Thomas would "stamp them done at customer request."

¶ 45    Thomas testified that she first met defendant—who, she noted, "visit[ed] [the Recorders] frequently"—during the Fall and Winter months of 2012. Defendant came to the Recorders Office to "record[] documents of—what he claimed was adverse possession." The State then showed Thomas five separate packets of documents that defendant filed with the Recorder's Office between 2012 and 2014. After authenticating the documents, they were admitted into evidence.

16

¶ 46     Each set of documents pertained to one of the properties that defendant stole. Thomas testified that, except for identifying information like address and Property Identification Numbers that was unique to each property, the document packets were substantially identical. Each packet consisted of multiple documents, including a "Nonadandoned Secured Interest of Property," a legal description of the property, an "Affidavit of Notice of Claim, an "Affidavit of Adverse Possession," and an "Affidavit of Adverse Possession Color of Title." Some of the documents were signed by defendant and notarized by a notary public; none were accompanied by a court order.

¶ 47     Defendant filed the packet for the Esmond Street Property on September 12, 2012. The Affidavit of Adverse Possession Color of Title stated that for "[m]ore than zero years immediately preceding" his filing, defendant had "maintain[ed] [the property], cut[] the grass, improv[ed] or do[ne] all acts necessary to maintain the property."

¶ 48     The packet of documents for the Wood Street Property was filed on November 14, 2013. The Affidavit of Adverse Possession Color of Title stated that, prior to filing, defendant had logged "not more than one year of paying taxes and improving fencing, doing all necessary maintenance to the said property."

¶ 49     In the packet of documents for the Rosemont Avenue Property that defendant filed on September 11, 2014, the Affidavit of Adverse Possession Color of Title stated that defendant had "paid the taxes on said realty each year for the past zero years as well as cutting the grass, improving fencing and doing all acts necessary in the maintenance of the said property."

¶ 50     Defendant filed the packet of documents for the Indiana Avenue Property on January 15, 2015. In the Affidavit of Adverse Possession Color of Title, defendant stated, "I have paid the

taxes on said realty each year for the past zero years as well as cutting the grass thereon, improving fencing and doing all acts necessary in the maintenance of said property."

¶ 51 The packet of documents for the Greenwood Avenue Property was filed on May 6, 2015. In the Affidavit of Adverse Possession Color of Title, defendant stated, "I have paid the taxes on said realty each year for the past zero years as well as cutting the grass thereon, improving fencing and doing all acts necessary in the maintenance of said property."

¶ 52 Thomas then testified that when defendant filed those documents, she told defendant that "these documents should have a court order" and advised defendant that he "should probably seek real estate attorney information to get the correct information to record the documents." In response, defendant told Thomas that he "knows the law, he studied the law and [Thomas] need [*sic*] to update [herself] on the law." Thomas then stated that based on her training and experience, none of the documents filed by defendant were "properly filed adverse possession documents" because "Illinois adverse possession law states that the occupant has to show proof of 20 years of maintaining the property and/or pay seven years of paying taxes[]" and "[a]ll of the documents" that defendant filed "stated zero years and under one year."

¶ 53                                    2. Detective Patrick McCafferty

¶ 54 Patrick McCafferty was a detective with the Chicago Police Department. In 2014, Detective McCafferty was assigned to participate "in an investigation involving the occupation of certain properties" after "community leaders" received "multiple complaints about the occupation of these properties." He explained that "[t]he nature of that investigation was that [defendant] *** had filed phony paperwork with the the Recorder of Deeds on properties in Chicago *** and those properties were being occupied."

¶ 55      During the initial stages of his investigation, Detective McCafferty reviewed the documents that defendant filed with the Recorder's Office pertaining to the Wood and Esmond Street Properties. Detective McCafferty also interviewed Gary Weglarz and Sharyn Kelly, realtors who worked for Aprilbrook Realty, the agency that owned the listing for the Esmond Street Property, who collectively informed Detective McCafferty that the Esmond Street Property was occupied. Detective McCaffery visited the Esmond Street property one or twice a week throughout 2014 and 2015, and the property "always appeared to be occupied and oftentimes, there was a vehicle in the driveway."

¶ 56      On January 12, 2015, Detective McCaffery and an FBI agent went to the Esmond Street property. The property still "appeared *** to be occupied" and "had some custom No Trespass signs affixed to it." McCafferty knocked on the door. No one opened the door, but McCafferty heard a male voice "answer[] the door" through what he "believe[d] to be an intercom. When he heard the voice, McCaffery announced his office and asked, without success, to conduct an interview. He then placed a business card in the door and left.

¶ 57      The next encounter occurred on April 16, 2015. Detective McCafferty was driving past the Esmond Street Property on his way to the police station. As he passed by, he saw a car parked on the driveway and a person standing next to the car. Detective McCafferty stopped his car and backed up, at which point he saw another person standing on the front porch. Detective McCafferty left his vehicle. As he approached the house, the person on the front porch went into the house and shut the door. Later that day, Detective McCaffery learned that the Cook County Sheriff was scheduled to do an eviction at the Esmond Street property the next day.

¶ 58      On April 17, 2015, Detective McCafferty returned to the Esmond Street Property to observe the eviction. During the eviction, he saw a person named Herman Johnson leave the

home. Detective McCafferty testified that Johnson was the person he saw enter the home while he approached the day before.

¶ 59     The topic of Detective McCafferty's testimony then shifted to the Wood Street Property. He explained that he reviewed documents pertaining to the property that were "nearly identical" to the documents he reviewed pertaining to the Esmond Street Property. He visited the property "once or twice a week" and that during those visits, "[t]he property appeared to be occupied." He noted that "[a]t times at night, there would be lights on," and he "also noticed the same No Trespass signs that were at the Esmond property."

¶ 60     After that, the State showed Detective McCaffery the adverse possession documents defendant filed with the Recorder's Office. Detective McCaffery noted that the documents "purport[ed] to claim possessory interest in the property through the Doctrine of Adverse Possession[.]" The State then asked Detective McCafferty whether he had "ever been aware of a circumstance where an individual could obtain a property through adverse possession simply by filing a document in the Recorder of Deeds Office claiming adverse possession?" Detective McCafferty answered "[n]o."

¶ 61     In June 2015, Detective McCaffery obtained a warrant to search the Wood Street Property. During the execution of that warrant, defendant was arrested.

¶ 62     The topic of Detective McCaffery's testimony then shifted to the Rosemont Avenue Property. In October 2014, Detective McCafferty learned that "documents were filed in the Recorder of Deeds Office with respect to" the Rosemont Avenue Property. He then testified that in October 2014, the Rosemont Avenue Property was occupied by a man named Arshad Thomas. He stated that U.S. Bank was the actual owner of the Rosemont Avenue Property. Detective McCaffery testified that he was "familiar with Arshad," as "Arshad Thomas and Sadie Thomas,

which is another member of his family, and other members of his family would typically occupy houses that Mr. Moore filed these documents upon."

¶ 63　The topic of Detective McCaffery's testimony then shifted to the Indiana Avenue Property. On March 26, 2015, Detective McCafferty went to the Indiana Avenue Property with a Federal Housing Finance Agency special agent. Detective McCaffery testified that the property "appeared to be occupied." He knocked on the door but did not receive an answer. During the visit, he learned that Sadie Thomas was living at the property and was given her phone number. Detective McCaffery called Sadie and left a voicemail "saying that there had been fraudulent documents placed against the property and *** requesting a phone call back," but Sadie never returned Detective McCafferty's call.

¶ 64　The topic of Detective McCaffery's testimony then shifted to the Greenwood Avenue Property. Detective McCafferty testified that the Greenwood Avenue Property was occupied by "Arshad Thomas and members of his family." He stated that the property was vacated when "[t]he police told Arshad Thomas and other members of the family that they would have to leave."

¶ 65　Thereafter, Detective McCafferty testified that each of the properties that he looked into during his investigation of defendant were "either in foreclosure or in the process of foreclosure[.]"

¶ 66　On cross-examination, defendant asked Detective McCafferty he "ever heard of adverse possession." Detective McCafferty answered "[y]es." Defendant then asked Detective McCafferty, "[d]o you know there's a Doctrine for Adverse Possession up under 735 ILCS 5/13-101?" In response, Detective McCafferty stated, "I'm not familiar with the language or that particular doctrine, no. I typically deal in criminal law." Defendant then asked Detective

McCafferty if adverse possession was a crime. In response, Detective McCafferty stated, "what I know is a crime is to file documents that are not legal and enter houses and take the houses."

¶ 67    Defendant then showed Detective McCafferty copies of documents he filed with the Recorder's Office and asked, "what's criminal about this?" The following colloquy ensued:

"A. Well, the—what's criminal about the—your actions was [*sic*] that these properties—these documents were filed fraudulently with the Cook County Recorder of Deeds and then the properties were then occupied and the rightful owners—

Q. Mm-hmm.

A.—were then unable to occupy or sell those properties.

Q. Yeah, but what's fraudulent about the document?

A. The document—so these documents themselves—so during the course of my investigation, what I did is I talked to the experts in these documents. The experts in these documents are the Cook County Recorder of Deeds Office, the attorneys that deal with real estate documents all the time—

Q. Mm-hmm.

A.—including the attorneys with the different mortgage companies—

Q. Mm-hmm.

A.—the special agents with Fannie Mae and the attorneys with the police department and attorneys with the city. Every one of those—"

[A sidebar took place where the court admonished defendant that he was eliciting improper opinion and hearsay testimony.]

\* \* \*

Q. Actually, on here, you don't see anything that's fraudulent? You just heard people tell you that the paperwork were—was fraudulent, according to their research and not yours?

A. According to—

Q. It was very impressive, all the people that you called.

***

Q. Right. Go ahead.

A. So all the legal experts that I consulted—

Q. Mm-hmm.

A.—to find out whether there was any legitimacy whatsoever—

Q. Mm-hmm.

A.—in these documents—

Q. Mm-hmm.

A.—if they would transfer any ownership in a legitimate fashion—

Q. Mm-hmm.

A.—all those attorneys and experts said absolutely not."

¶ 68    Later, defendant informed Detective McCafferty that he sent copies of the documents he filed with the Recorder's Office to law enforcement agencies. Defendant then asked Detective McCafferty, "would this strike you as somebody that's operating with a criminal intent? I mean, would I send notice to the FB and I and all that I was burglarizing and doing theft to a property? Does that seem like something or a burglar or somebody that's committing theft would do?" The following colloquy ensued:

"A. I'm not—so—I'm not sure if—what the question is.

Q. I sent notice to these agencies of my intent and in the process of this, I was showing that there wasn't any type of criminal intent on my part. So what I was asking you, is that—being that I did send notices to different law enforcement agencies, do that strike you as somebody that's committing a crime?

A. Yes. Because you stole these properties.

Q. How so?

A. The—the properties were owned by somebody else and you filed fraudulent paperwork on these properties and then rented these properties for money and you never owned any of these properties."

¶ 69                             3. Detective Purdy

¶ 70     Chicago Police Detective Patrick Purdy worked in the department's Financial Crimes Unit and was detailed to a task force with the FBI. In January 2015, the task force began investigating defendant after the police received complaints about people "illegally occupying vacant properties and filing fraudulent documentation with the Cook County Recorder of Deeds Office." Detective Purdy's role in the investigation was initially focused on the Rosemont Avenue Property. He explained that he spoke to an investigator with the Recorder's Office named Quinton Woods, who gave the task force "documents that were filed fraudulently pertaining to [the Rosemont Avenue Property] claiming adverse procession of that property" bearing defendant's signature.

¶ 71     Detective Purdy then recounted the steps in his investigation pertaining to the Wood Street Property. On the morning of June 24, 2015, while conducting surveillance, he saw defendant "exit the property from the rear," enter a vehicle, and drive away.

¶ 72    On June 30, 2015, Detective Purdy learned that defendant had been arrested by the Chicago Police Department. Detective Purdy and FBI Special Agent Brad Culligan interviewed defendant at the police station. During the interview, defendant said that he had been "studying adverse possession from law books for several years" and claimed that he was "well briefed on the law of adverse possession." Defendant also (1) claimed that "banking laws were corrupt and worked against the people of the United States[,]" (2) stated that the banking system was "set up to fail[,]" and (3) opined that the banking industry was "fearful of people—that had knowledge such as himself." Defendant explained that when he first started filing documents to claim adverse possession over property, he used his name, but he eventually started using the name "Adverse Charity Trust" to claim property. Defendant denied accepting rent for the properties he possessed, instead claiming that he accepted "donations" made payable to Adverse Charity Trust. Defendant then stated that he could convert "property from a private residence to private property" in order to "get into a tax ex settlement status."

¶ 73    4. Evidence Concerning the Wood Street, Esmond Street, and Indiana Avenue Properties[1]

¶ 74                            a. Alice Collins—The Wood Street Property

¶ 75    Alice Collins testified that in 2014, she worked for the Beverly Area Planning Commission (BAPA), a non-profit community organization whose work focused on crime, safety, "problem properties," and the "promotion of real estate and public safety." Collins testified that she often "partnered with the local police as well as community residents focused on crime and safety issues and then also worked to prevent foreclosures and blighted properties in the Beverly-Morgan Park community." As part of that work, Collins used a database called Public Records Information Service (PRIS) to research foreclosed properties, send homeowners

---

[1]These three properties have been grouped together because all three were owned by Fannie Mae at the time of trial.

"letters to avoid foreclosure," and "monitor[] the sale of the homes or ownership of the homes in order to prevent them from becoming blighted." Collins also tracked foreclosures and vacant properties by conducting research on the website maintained by the Cook County Recorder of Deeds. In the Summer of 2014, Collins "bec[a]me aware" that defendant was involved with the Wood Street Property. While researching the status of that property, she discovered defendant's name "in the chain of title," which "struck [her] as strange because [she] didn't see any exchange of funds denoted in that change of title."

¶ 76    Through further research, Collins then learned that a real estate agency called PRS owned a listing for the Wood Street Property, and that a real estate agent named Barbara Thouvenell was the listing agent. After those discoveries, Collins spoke to Thouvenell and learned that "there had not been a valid sale" of the Wood Street Property to defendant.

¶ 77    After her conversation with Thouvenell, Collins broadened her search by querying defendant's name on the grantor/grantee index on the Cook County Recorder of Deeds website. That search revealed "additional properties attached to [defendant] that appeared to have similar transactions that had occurred."

¶ 78    In October 2014, Collins presented her findings about defendant to Detective McCafferty. The Chicago Police Department then opened an investigation into defendant.

¶ 79    On cross-examination, defendant asked Collins whether she was aware of the doctrine of adverse possession before she contacted the police and FBI. In response, Collins explained that she began her investigation after Thouvenell informed her that she was listing the Wood Property "and that it had been broken into and a For Sale sign removed and, therefore, she had to halt her listing." According to Collins, Thouvenell "mentioned *** that someone named Torrez Moore

26

was living in the home[,]" and Collins explained that that "was the name I saw on the title—the Adverse Possession Title."

¶ 80    Thereafter, defendant confronted Collins with a copy of the chain of title and asked her whether she saw "anything illegal" about it. In response, Collins explained that "[t]he fact that it appeared that no funds had changed hands[,]" as well as the fact that "the house had been broken into" and "someone was living there without the owner's permission" was "a red flag for me."

¶ 81                  b. Barbara Thouvenell—The Wood Street Property

¶ 82    Barbara Thouvenell testified that she worked as a real estate broker for PRS Associates. In August 2013, she received a referral from Fannie Mae for the Wood Street Property. When she received the referral in August 2013, the property was "partially occupied." She explained that "[t]he former owner, he was hospitalized and in and out of the hospital." The former owner eventually vacated the property via a process called "Cash for Keys," in which "in return for leaving the property in broom swept condition, usually the occupant gets a check from the bank or the financial institution to hand us the keys." Asked whether the Cash for Keys program would "apply to individuals who could be characterized as squatters," Thouvenell answered "[n]o[]" and clarified, "[i]t's a program for the former owners or tenants." In November 2013, Thouvenell placed a "broker price opinion" on the property valuing it at $159,000.

¶ 83    In February 2014, Thouvenell began noticing "changes in the property." She explained that "[t]here were some window treatments put up, there was a sign in the window, [and] ***the locks had been changed." Throughout 2014 and into 2015, Thouvenell continued to monitor the property and saw continued evidence that it was occupied. She explained, "I could notice, if I went at night, that there were lights on. I noticed that the grass had been cut, the snow had been

shoveled. It had been minimally maintained on the outside and I could see evidence of lights being on and off at different times."

¶ 84    In June 2015, Thouvenell learned that the property had been vacated after the police arrested a person that was inside the property. Thouvenell testified that she never gave defendant permission to enter the Wood Street Property, nor did she give him permission to change the locks. Once the property was vacated, Thouvenell "performed another broker price opinion of value" because "the market had changed." Thouvenell testified that she listed the property for sale in November 2015 and that "[w]ithin a month," it sold for "191,000 and some, maybe— 191,5 or around there."

¶ 85            c. Detective Brian Gibbons—The Wood and Esmond Street Properties

¶ 86    On June 30, 2015, Chicago Police Detective Brian Gibbons was assigned to execute a search warrant at the Wood Street Property. He was responsible for "[c]ollect[ing] and catalog[ing] all items that were recovered during the execution of the search warrant." The police executed the warrant by knocking on the door, which defendant answered. A woman who identified herself as defendant's wife was also present inside the property.

¶ 87    Detective Gibbons then identified and discussed several pieces of evidence that he recovered during the search. The first document was a notice dated February 1, 2013 that pertained to the Esmond Street Property. The notice was sent by a "broker from a real estate company," and advised that "all occupants [of the Esmond Street Property] should immediately contact the party named below to discuss the status of the occupancy." The document was accompanied by the broker's business card, a woman named Sheryl Gordon.

¶ 88    The second document was a letter, also pertaining to the Esmond Street Property, that was dated February 15, 2013. As recounted by Detective Gibbons, the letter stated, in part,

"please call me at a certain number, ask for Lucy. We would like to shut off the water and change locks if you move out or we can discuss the relocation progress on this property."

¶ 89    The third and fourth documents, which also pertained to the Esmond Street Property, was a series of letters dated February 7 and 8, 2013 from Fannie Mae. The letters stated "important notice to occupants of *** 10929 South Esmond" and were again accompanied by Gordon's business card.

¶ 90    The fifth document was dated January 29, 2014 and pertained to the Wood Street Property. The document was titled "Important Notice to Tenants" and identified the property's owner as "Federal National Mortgage Association a/k/a Fannie Mae." The notice was accompanied by a business card for "Charles Miller from Miller Real Estate Management."

¶ 91            d. Special Agent Christopher Lane—The Wood Street Property

¶ 92    Christopher Lane was a Special Agent with the Federal Housing Finance Agency (FHFA), Office of the Inspector General. The FHFA was responsible for overseeing and regulating Fannie Mae. Lane was a member of a task force that included individuals from the FBI and Chicago Police Department investigating "property takeovers" by defendant.

¶ 93    On January 12, 2015, Special Agent Lane went to the Wood Street Property with FBI Special Agent Jennifer Erick to "identify the occupants of the house." When they arrived, he noticed a No Trespassing sign near the front door. Lane and Special Agent Erick then went to the back door and knocked. "After some time," defendant answered the door. Lane then told defendant that they "wanted to ask him some questions about how he came to occupy that house." Lane then showed defendant some of the documents he had filed with the Recorder's Office and asked him to confirm that the signature on the documents was his. Defendant confirmed that the signature was his. Lane then showed defendant a letter Fannie Fae sent to

defendant "advis[ing] him that the property is Fannie Mae's" and that he "needs to vacate the property." Defendant confirmed to Lane that he received the letter. At that point, defendant declared that he "wanted any further communication with us to be done by mail through the use of an affidavit or Interrogatories." Lane then testified that before the interview ended, he advised defendant that "he was not occupying the house legally."

¶ 94    On June 30, 2015, Lane and other members of the task force executed a search warrant at the Wood Street Property. During the search, Lane recovered various documents addressed to or sent by defendant, including: (1) a certified mail receipt that listed the sender as "Torres of the house Moore, general post office, judicial district" and the sender's address as the Esmond Street Property; (2) a "notice of intent to file forcible entry and detainer action and demand for possession" sent by City Mortgage pertaining to the Esmond Street Property; (3) a letter from a law firm representing Fannie Mae pertaining to defendant's occupation of the Wood Street Property; (4) a "final notice" from the Circuit Court of Cook County regarding eviction proceedings pertaining to the Esmond Street Property; (5) a packet of documents pertaining to the Greenwood Avenue Property bearing defendant's signature that was filed with the Recorder's Office; (6) a packet of documents pertaining to the Esmond Street Property bearing defendant's signature that was filed with the Recorder's Office; and (7) a packet of documents bearing defendant's signature pertaining to the Rosemont Avenue Property that was filed with the Recorder's Office.

¶ 95                    e. Linda Dominguez—The Esmond Street Property

¶ 96    Linda Dominguez worked as a business operations analyst for City Mortgage. She testified that on June 29, 2011, City Mortgage owned the Esmond Street Property, which it obtained via foreclosure. City Mortgage had control and possession of the Esmond Street

Property until February 9, 2012, when the property was assigned to Fannie Mae. Fannie Mae, in turn, exercised possession and control over the Esmond Street Property until March 4, 2013, when it reassigned the property back to City Mortgage. On June 30, 2015, City Mortgage was still in possession and control of the Esmond Street Property.

¶ 97     Thereafter, City Mortgage never gave defendant or anyone else permission to take possession, rent, or file paperwork on the Esmond Street Property. City Mortgage paid the Esmond Street Property's property taxes during its periods of ownership. When asked "[w]hat was the value of the property or what was unpaid principal balance of the property when City Mortgaged" initiated foreclosure proceedings, Dominguez stated, "[i]t was approximately 370, 400-and-some. I don't have the exact amount." The State then clarified, "$370,000 approximately[,]" to which Dominguez responded, "[t]hat is correct." She then testified that the property sold sometime after June 2015 for $164,000.

¶ 98                          f. Florious LaBranche—The Esmond Street Property

¶ 99     Florious LaBranche testified that she lived directly across the street from the Esmond Street Property. She stated that in 2010, the Esmond Street Property entered foreclosure and "the bank took it over." Afterwards, the property remained vacant for a year. During that period, the property remained in "decent condition" because "the bank kept the property up."

¶ 100   LaBranche met defendant in Fall 2012 when she saw defendant and "another guy" standing in front of the property next to hers. LaBranche asked them if they were buying the Esmond Street Property, "and they said yes." According to LaBranche, defendant "said that they were going to get [the Esmond Street Property]." The State then asked LaBranche if she ever found out if defendant began living at the Esmond Street Property. LaBranche testified that she did not know if defendant lived there. However, she did note that after her first encounter with

31

defendant, she saw him "coming and going" at the property and sometimes saw him "on the balcony and stuff." She also testified that she saw defendant in areas of the property that he could only have gotten into by gaining access to the home, such as the garage and basement.

¶ 101   LaBranche recounted a conversation she had with defendant about his "claim" to the Esmond Street Property. She "asked [defendant] about the house and everything." In response, defendant "said he was taking—getting the house as homesteader." Elaborating, she stated that defendant said he was claiming the Esmond Street Property "[a]s a homesteader to take the home back and give it back to the community." Defendant "gave [her] a tape explaining how the homesteader act works and how the claim would be to take over that particular property."

¶ 102   LaBranche testified that, throughout the foreclosure process, the property remained in good condition. The bank sent people to "check to make sure no one had broken into it. They did the lawn. They did, you know, the grass and the lawn and bushes and stuff and picked up trash." But after defendant became involved with the property, its exterior condition deteriorated. She explained that "[t]he grass wasn't cut, snow wasn't shovelled [*sic*], and trash wasn't being picked up." As a result, LaBranche became concerned about the property's condition, so she "called the Recorder of Deeds" and "went on-line and looked the property up to see who the actual owner or who supposedly owned the home." Her research revealed that the property was still in foreclosure and owned by Citibank.

¶ 103   LaBranche recounted a time in Spring 2014 when defendant set up a hot dog stand on the Esmond Street Property. The hot dog stand concerned LaBranche because "it was set up on the outside of the garage next to an alley" and had "no running water." Moreover, according to LaBranche, the hot dog stand "deteriorated the property" and "didn't go with the community being on a residential street."

¶ 104   Toward the end of 2014, defendant told LaBranche that he was moving down the Street to the Wood Street Property. Around that same time, LaBranche noticed that the Esmond Street Property was being occupied by a man named Herman Johnson. LaBranche testified that before he moved into the Esmond Street Property, Johnson lived next door to her. In Spring 2015, LaBranche learned that Johnson had been evicted from the Esmond Street Property. LaBranche testified that the property never fell into disrepair following Johnson's eviction.

¶ 105   On cross-examination, defendant insisted that when he spoke to LaBranche, he referred to adverse possession, not homesteading, but LaBranche insisted she remembered him referring to homesteading.

¶ 106                    g. Officer Duszak—The Esmond Street Property

¶ 107   O n September 27, 2013, Chicago Police Officer Duszak saw defendant "[w]alking from the walkway in front of the stairs" by the front door of the Esmond Street Property. Officer Duszak spoke to defendant. Defendant told Officer Duszak that he lived at the Esmond Street Property.

¶ 108                    h. Sharon Kelly—The Esmond Street Property

¶ 109   Sharon Kelly worked as a field representative for Apple Brook Realty. Her responsibilities include "check[ing] occupancies of homes that are in foreclosure, [to] see if anybody responds to liv[ing] there." Her boss was Gary Welgarz.

¶ 110   On February 15, 2013, Kelly went to the Esmond Street Property. She saw a sign on the front door that said "no government officials were allowed on the property. That it was in a civil court." She also discovered that someone had placed a Private Property sign on a back window. Kelly testified that she "assumed somebody was in there trying to remain in the house."

¶ 111   Between March and May, Kelly returned to the property several times and left multiple Lucy Letters. On May 29, 2013, Kelly visited the property again and left another letter. She testified that after that visit, she received a threatening phone call telling her she was "not allowed to come back to that property."

¶ 112   In August 2014, Kelly visited the property and came to believe it was vacant. On August 11, 2014, Kelly sent a locksmith to the property to change the locks. Kelly testified that the locksmith went to the property and began changing the locks, but eventually stopped because he saw personal items in or around the house and became uncomfortable.

¶ 113   On August 12, 2014, the property was inspected. The inspection revealed that someone had broken into the basement door. From that time through April 2015, Kelly continued visiting the property to conduct exterior inspections and post Lucy Letters.

¶ 114   Eventually, Kelly learned that the sheriff's office was going to perform an eviction at the property on April 15, 2015. Kelly went to the property to observe the eviction. The sheriffs approached the front door and spoke to someone inside before eventually removing him from the property. After making repairs, Kelly testified that the property was listed for sale and eventually sold for $164,000. From February 2013 to April 2015, the property had a no-trespassing sign.

¶ 115                   i. Jacqueline Wheeler—The Indiana Avenue Property

¶ 116   Jacqueline Wheeler was the treasurer of the Chatham Club Home Owner's Association. The association consisted of 143 properties, including the Indiana Avenue Property. Wheeler testified that in early 2015, the Indiana Avenue Property was vacant. She explained that one of the home's owners died, and the other occupant "just walked away from the house" without selling it. She noted that "[s]everal real estate people posted their signs saying they're going to I guess sell it, but they never did[,]" so the property "became vacant."

¶ 117   Sometime in late Winter or early Spring 2015, Wheeler went to the property with another board member and a neighbor named David Henry, because people were "complain[ing] about the fact that someone was there" when "no one should be there." When they got to the property, they knocked on the front door. A woman answered the door and identified herself as Cynthia Thomas. Thomas showed the group "a document that said adverse possession notice or something" and a lease for the property. Wheeler learned that defendant was the "landlord" for the property. When Thomas showed the documents, Wheeler asked if she could take them to make copies. According to Wheeler, Thomas "hesitated" and then said "no." Wheeler then told Thomas that she was "paying rent to somebody that does not own the property." In response, Thomas gave Wheeler defendant's name and phone number.

¶ 118   Wheeler then called defendant and left a voicemail message. On the message, Wheeler informed defendant that he was not supposed to rent the Indiana Avenue Property because he did not own it. Defendant never returned Wheeler's call.

¶ 119   Eventually, the occupants were removed, and the home became vacant. The home was then rehabbed and eventually sold.

¶ 120                 j. Detective Mike Zuber—The Indiana Avenue Property

¶ 121   On June 30, 2015, Chicago Police Detective Mike Zuber was assigned to a task force that was responsible for executing a search warrant at the Indiana Avenue Property. Before June 30, he had little involvement in the investigation. During the search, Detective Zuber recovered doorknobs, a lock, and a padlock from a drawer in the kitchen. From a different kitchen drawer, Detective Zuber recovered another lock and doorknob, as well as a "chain with a cut padlock." After the police executed the warrant, they left an "advisory letter" with the occupants "stating to vacate the property."

¶ 122                    k. Benjamin Safford—The Indiana Avenue Property

¶ 123    Benjamin Safford testified that from 2013 to 2016, he worked as a "field tech" for a real estate company named JBB Management. His job was "dealing with foreclosed properties" by "servicing the properties weekly, photographing conditions, [and] checking occupancy weekly." He explained that "if the properties were occupied," he would "track[] them to make sure that they weren't abandoned," and "[i]f they were vacant," he would "set[] up lockboxes so that brokers could access them and real estate agents could access them or contractors that were doing repairs on the homes, hanging For Sale signs ***."

¶ 124    JBB Management was responsible for managing the South Indiana Avenue Property. On February 9, 2015, Safford went to the South Indiana Avenue Property in response to a report the previous day from a contractor stating that "the locks had been changed and that someone was occupying the unit." When Safford arrived at the property, he noticed that a "For Sale" sign as well as a "warning sign with the brokerage phone number" had been removed from the front window. In addition, lockboxes on the gas meter and front door had been removed, and the locks had been changed.

¶ 125    During the visit, Safford knocked on the door. A woman named Sadie Thomas answered the door. Thomas told Safford that she was renting the house and presented a lease that listed defendant as the landlord. JBB eventually had Thomas removed from the property. Thereafter, Safford began making weekly visits. During these visits, Safford discovered that the property was still occupied. In June 2015, Safford was present for a raid in which "[t]he sheriffs and members of the FBI went into the property to clear it ***." He explained he was "there with the locksmith to facilitate the lock change after the people were removed." Safford testified that to his knowledge, no one had permission to move into the Indiana Avenue Property.

¶ 126   12. Randy Conatser—Wood Street, Esmond Street, and Indiana Avenue Properties

¶ 127   Randy Conatser was a foreclosure manager for Fannie Mae. He testified about the Wood Street Property, Esmond Street Property, and Indiana Avenue Properties.

¶ 128   With respect to the Wood Street Property, Fannie Mae acquired possession and ownership via foreclosure in August 2013. Fannie Mae then engaged Barbara Thouvenell, a realtor with PRS Realty, to manage the property. On December 31, 2015, the Wood Street Property was sold for $191,477.

¶ 129   With respect to Esmond Street Property, Fannie Mae acquired possession and ownership via foreclosure in January 2012. Before Fannie Mae acquired the property, it was owned by City Mortgage. In February 2013, Fannie Mae "required City Mortgage to repurchase" the Esmond Street Property. Fannie Mae engaged Gary Weglarz, a realtor with Applebrook Realty, to manage the property. The Esmond Street Property did not sell while it was owned by Fannie Mae. When the property went into foreclosure, the unpaid balance on the property's mortgage was $370,500.

¶ 130   With respect to the Indiana Avenue Property, Fannie Mae acquired possession and ownership via foreclosure in April 2014. Fannie Mae engaged Brandt Booker, a realtor with Sotheby's, to manage the property. On May 10, 2016, the Indiana Avenue Property was sold for $190,000. When the property went into foreclosure, the unpaid balance on its mortgage was $238,500.

¶ 131   Conatser never gave defendant permission: (1) to occupy; (2) rent on Conatser's or Fannie Mae's behalf; (3) change the locks; or (4) remove anything from the Wood Street, Esmond Street, and Indiana Avenue Properties. He further testified that while Fannie Mae was in possession of those properties, it paid the property taxes on those properties.

¶ 132                                    5. The Greenwood Avenue Property

¶ 133                                       a. Officer Matthew Birdsong

¶ 134   On April 1, 2015, Chicago Police Officer Matthew Birdsong was dispatched to the Greenwood Avenue Property. Other officers were already on-scene and speaking to some of the property's occupants, who he described as "male *** African American between the ages of— teenage years, mid 20s maybe." The occupants were still in the home when he arrived. In addition to the occupants, Officer Birdsong saw a person named Leon Ivy, who claimed to be the property manager. According to Officer Birdsong, Leon stated that he went to the property, which was previously vacant, to do some work and discovered that a For Sale sign had been removed, and there were people living inside.

¶ 135   Officer Birdsong then spoke to the people inside the property, several of whom had the last name "Thomas." Later, defendant came to the property. Defendant told Birdsong that he had obtained the property through adverse possession and was renting it to the occupants. The occupants and defendant produced documents bearing the letterhead of the Department of Transportation, but his superiors determined that they were "false."

¶ 136   Once that determination was made, the police spoke to defendant again to give him "an opportunity to show us some sort of documentation, anything he could provide to show us that what he was saying was legitimate," which defendant was unable to do. Eventually, Birdsong told defendant that the people in the building "needed to leave" and that "they have no established residency there."

¶ 137   In response, defendant "became very highly agitated" and "very verbally combative" and began "swinging his arms all over and getting very loud with the volume of his voice and stepping to and from to us." Defendant eventually told the police, "just take me to jail." They

did. Once defendant was placed in custody, Birdsong spoke to the occupants, telling them that "it was in their best interest that they need to leave because it's not their property" and that they were "illegally occupying it." The people then "packed up their things" and vacated the property.

¶ 138                                    b. Leon Ivy

¶ 139    Leon Ivy was the Director of Sales and Acquisitions for a company called Manage Chicago, Inc., a real estate company that bought, sold, and managed property. The Greenwood Avenue Property came under Manage Chicago's control in March 2014; Ivy was the property's listing agent and manager. As part of his job duties, Ivy visited the Greenwood Avenue Property "[u]sually twice a week[,]" which included performing an interior inspection of the property.

¶ 140    Ivy then testified that on April 1, 2015, a realtor called asking to show the Greenwood Avenue Property. Ivy gave the realtor the lockbox code. Approximately 30 to 40 minutes later, the realtor called back and said "Hey, your lockbox is gone and there are people on your property." That was surprising because, that last time Ivy had visited, the Greenwood Avenue Property had a For Sale sign, an alarm, locks, and a lockbox for realtors.

¶ 141    Ivy "immediately went to the property and noticed the sign and lockbox were gone and a young guy answered the door." Ivy also stated that the locks had been changed. Ivy testified that the person who answered the door identified himself as "Arshad."

¶ 142    The following day, Ivy called the police, stated that there were "unauthorized *** occupants on the property," and asked the police to meet him at the property. Ivy then returned to the Greenwood Property, where, in addition to Arshad, he observed "about seven or so other people were in the property." Ivy testified that once the police arrived, "we questioned the guys and—Arshad, mainly—about why they were there." According to Ivy, Arshad "explained the house belonged to them, some weird phrase he used and that they were going to call—I believe

he referred to [defendant] as his uncle or something." Thereafter, according to Ivy, approximately an hour to an hour and a half later, defendant "came walking down the street" and "had a conversation with the police."

¶ 143   Thereafter, the State asked Ivy, "what was the value of [the Greenwood Avenue Property] at that time when it was for sale?" Ivy answered, "[w]e had it listed at about 140,000." Ivy testified that the Greenwood Avenue Property eventually was sold. He stated that he never, at any time before the property was sold, gave permission to anyone, including defendant, to enter, possess, or rent the property, nor did he give anyone, including defendant, permission to remove the lockbox, change the locks, or remove anything from the property.

¶ 144   On cross-examination, Ivy testified that Chicago Manage purchased the Greenwood Avenue Property following a foreclosure. He stated that at the time he discovered Arshad and his family at the property, it had been vacant and on the market for three to four months.

¶ 145                     6. Rosemont Avenue Property

¶ 146                     a. Elizabeth Fitzpatrick

¶ 147   Elizabeth Fitzpatrick worked as a real estate agent with Caldwell Banker in 2014. She also operated a staging company that furnished vacant homes to prepare them for sale. She had experience working with properties in foreclosure. When working with foreclosures, she "take[s] guardianship of the property[,]" puts "all the utilities in [her] name[,]" "take[s] care of the lawn service[,]" and "take[s] care of any repairs."

¶ 148   In June 2014, Fitzpatrick was engaged to list the Rosemont Avenue Property. She also staged the property using items she personally owned. From June to October 2014, she visited the property several times a week to perform inspections, take pictures, meet repairmen, and facilitate showings with other brokers and customers.

¶ 149   Sometime in late October 2014, Fitzpatrick visited the Rosemont Avenue Property and noticed that her "Caldwell Banker sign was not on the front lawn." She also observed a No Trespassing sign posted on the door that had not been there when she last visited the property. (The sign was the same No Trespassing sign previously discussed). As Fitzpatrick approached the house, she noticed that "the windows were covered in what looked like brown butcher paper" which prevented her from seeing into the home. When she reached the front door, she saw that the lock box where she kept keys to the home had been removed. She was unable to enter the home, not having access to the keys stored in that lock box.

¶ 150   Fitzpatrick then looked through a small gap in brown paper near the door and saw two or three people inside the home. Fitzpatrick "knocked on the door and said, you know, who are you? What are you doing in this house?" She testified that the people inside the home "just laughed at me" and "said go away."

¶ 151   After that encounter, Fitzpatrick called her supervisor, then the police. A week or two later, the police called Fitzpatrick and asked her to accompany them to the Rosemont Avenue Property to help identify which items of property inside the home belonged to her. Fitzpatrick stated that when she and the police arrived, three "black men" came out onto a balcony off the master bedroom and began "taunting the police and laughing and swearing."

¶ 152   When the Rosemont Avenue Property was first listed for sale, it was priced at $729,900. But the property was damaged by the occupants and had to be taken off the market while repairs were made. Specifically, Fitzpatrick explained that "the custom front doors had to be replaced," as well as a side door and the garage door. In addition, Fitzpatrick had to "get rid of" some of her staging items, and "[t]here was something wrong with the master bedroom Jacuzzi tub which had to be repaired." All in all, Fitzpatrick estimated that the property had sustained "around $10,000"

in damages. Fitzpatrick testified that the Rosemont Avenue Property eventually sold in April 2015 for "about" $675,000. When asked by the State whether the property's value was "affected by this incident," Fitzpatrick answered "[y]es."

¶ 153   When Fitzpatrick was guardian of the Rosemont Avenue Property, U.S. Bank paid the property taxes. She never gave defendant permission to "take over" the Rosemont Avenue Property. Likewise, she never gave defendant permission to rent the property, take down her signs, change locks, remove the lock box, or file paperwork with the Recorder of Deeds regarding the property.

¶ 154                                   b. Lieutenant William Mullane

¶ 155   Chicago Police Lieutenant William Mullane testified that at around 11:30 a.m. on October 22, 2014, he responded to 4200 West Rosemont Avenue. Lieutenant Mullane saw "one of my sergeants, a few of my officers there, a realtor who had the listing of that property, and there were subjects inside the house." Lieutenant Mullane spoke to the people in the home. He remembered two of their names—Arshad and Yusef Thomas—but he could not recall the name of a third person who was inside the home.

¶ 156   During the visit, Mullane learned that the Rosemont Avenue Property was for sale. He also learned that the people in the home were "claim[ing] that they were tenants in the house, that they had a lease, and that they were living there with their father." Mullane stated that the people in the home were using a legal term with which he was unfamiliar. He also explained that while he was on-scene, he accessed the Recorder's website and saw that "there was a filing recently filed regarding that property and possession of it" that "referred to adverse possession."

¶ 157   At that point, Lieutenant Mullane left. But his investigation continued. He explained that after the October 22 visit, "we learned that the property was not available for lease, that it was

the property of the agent that was selling it for a company, and that there should be nobody in the house." Consequently, on October 28, 2014, Lieutenant Mullane and other law enforcement officers returned to the Rosemont Avenue Property to (1) "see if somebody was there[,]" (2) "inform them that if there is a lease, that it is not a valid lease because nobody had the right to lease the property[,]" and (3) "notify them that they didn't belong there and that they had 24 hours to leave the property" or "they would be arrested for trespassing."

¶ 158    During the October 28 visit, Lieutenant Mullane determined that the property was occupied. He explained that "[t]wo subjects came out of the property, and there was another subject up on the roof of the garage." Mullane then spoke to Arshad, and Yusef showed him a lease for the property that listed defendant as the landlord. At that point, Mullane "advised them that nobody had the right to lease the property and that they had 24 hours to remove themselves from the property. Otherwise, they would be removed and charged with criminal trespass."

¶ 159    On October 29, 2014, Lieutenant Mullane returned to the Rosemont Avenue Property. He was accompanied by two police officers and a SWAT team. Initially, Lieutenant Mullane approached the home with the two officers and knocked on the door. Lieutenant Mullane heard "voices on the other side of the door." He "explained to them that there should be nobody in the property" and instructed the people inside the home to come out—a request they "refused." At that point, Lieutenant Mullane "signalled [*sic*] for forceable entry" and "stepped out of the way and let the SWAT Team enter the property." After the SWAT team entered the home, the people inside were removed and arrested.

¶ 160    Lieutenant Mullane then testified that there was a No Trespassing sign posted on the front door. (The sign, which was admitted into evidence, was identical to the No Trespassing sign posted outside the Esmond and Wood Street Properties.). After the occupants were removed,

Lieutenant Mullane and the officers entered the home, where they discovered a "for sale" sign in a closet in the basement and a deadbolt lock that had been "compromised." In addition, Lieutenant Mullane also noted that the master lock used by the realtors to secure keys to the home had "clearly been forced open."

¶ 161   After that, the State rested. Defendant did not present any witnesses. In closing argument, defendant complained about the secrecy of the banking system and lamented the unfairness of foreclosures. He asked, rhetorically, "What do people do? Especially if you don't have no money?" His answer: "[Y]ou can find solutions in the law." And that solution was adverse possession, which was "not a crime." He urged that "we" should "fight against this [banking] system" to protect the homeless and children and the poor." "And adverse possession," he argued, "is just the rock that I'm using in my sling against this Goliath ***."

¶ 162   After deliberating, the jury found defendant guilty of theft, continuing financial crime enterprise, and financial institution fraud. The court then held a sentencing hearing and ultimately sentenced defendant to 11 years' imprisonment. This appeal followed.

¶ 163                                    B. Analysis

¶ 164   Defendant raises several challenges to the sufficiency of the evidence. He claims the State failed to prove that his actions were "in furtherance of a single intention and design" as required to join his various thefts into one crime that aggregates the value of all property stolen. He likewise claims that the State failed to prove a criminal motive and failed to prove the values of the various properties. We take the questions in that order. We consider all the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48.

¶ 165                    1. "Single Intention and Design"

¶ 166   Defendant committed five separate acts of theft that could have been charged separately. Instead, the State charged all five thefts as one offense, so it could aggregate the values of the five properties into a single Class-X felony offense of theft of property over $1 million. (It charged two fraud offenses, too, but recall that they merged into the theft count on which defendant was sentenced.)

¶ 167   To combine the multiple thefts into one count, the State used section 111-4(c) of the Criminal Code, the joinder statute. See 725 ILCS 5/111-4(c) (West 2014). Section 111-4(c) provides that two or more acts or transactions that constitute certain enumerated theft- or fraud-related crimes may be charged as a single offense in a single count if, among other reasons, "such acts or transactions by one or more defendants *are in furtherance of a single intention and design* ***." (Emphasis added.) *Id*.

¶ 168   Defendant here is charged with scheming to take possession of five different properties, in one form or another (dwelling in it or renting it out as if he were the owner), in a specific way, claiming the right of adverse possession over those properties. And through the joinder statute, the State aggregated the values of the properties into one theft of property exceeding $1 million in value.

¶ 169   When the State relies on this joinder language, as it did here on the theft charge (as well as the charges on which defendant was convicted), the allegation that the acts were "in furtherance of a single intention and design" is an element of the offense that the State had to prove beyond a reasonable doubt. *People v. Rowell*, 229 Ill. 2d 82, 101 (2008); *People v. Walton*, 2013 IL App (3d) 110630, ¶ 23. Defendant claims the State failed to carry that burden.

¶ 170    Before determining whether there was sufficient evidence that defendant's conduct fell within that statutory language, we must determine what that language means. So our sufficiency-of-the-evidence analysis devolves momentarily into a question of statutory construction and thus one of law. See *People v. Smith*, 2019 IL App (1st) 161246, ¶ 24 (sufficiency of evidence of aggravated sexual assault depended on meaning of statutory phrase "during the commission of"); *People v. Barnes*, 2017 IL App (1st) 142886, ¶ 21 (sufficiency of evidence of armed-violence conviction depended on interpretation of mob-action statute that served as predicate for conviction).

¶ 171    We must determine, in other words, what it means for multiple acts to be committed "in furtherance of a single intention and design." We start with the plain language of the statute. *Board of Education of City of Chicago v. Moore*, 2021 IL 125785, ¶ 20 (most reliable indicator of legislative intent is plain meaning of language).

¶ 172    The word "intention" is a term rarely seen within the Criminal Code of 2012 compared to the truncated and far more familiar "intent." But we find the words "intention" and "intent" to be synonymous for our purposes.

¶ 173    First, as for any undefined statutory word, "it is entirely appropriate" to turn to the dictionary. *People v. Perry*, 224 Ill. 2d 312, 330 (2007). Black's Law Dictionary defines "intention" as "the willingness to bring about something planned or foreseen; the quality, state, or condition of being set to do something." Black's Law Dictionary (11th ed. 2019) ("Intention"). That is not very different than its definition of "intent," which is "the mental resolution or determination to do" a thing. *Id*. ("Intent"). Indeed, Black's definition of "intent" is nearly

46

identical to Merriam-Webster's definition of "intention," which is "a determination to act in a certain way" and references, as a synonym, "intent."[2]

¶ 174    Beyond that, we would add that our supreme court has agreed with this court that the phrase "single intention and design" includes a mental state. See *People v. Rowell*, 229 Ill. 2d 82, 101 (2008); *People v. Arbo,* 213 Ill. App. 3d 828, 832 (1991). We are aware of four mental states recognized in Illinois criminal law, including "intent." See 720 ILCS 5/4-4 – 4-7 (West 2012) (defining mental states of intent, knowledge, recklessness, and negligence). So it would be odd if the word "intention" did not mean "intent," a term quite familiar to the criminal law.

¶ 175    That brings us to the word "design" within the phrase "single intention and design." Black's tellingly defines "design" in its noun form as "1. A plan or scheme. 2. Purpose or intention combined with a plan." Black's Law Dictionary (11th ed. 2019) ("Design"). Merriam-Webster's most applicable definition is "a mental project or scheme in which means to an end are laid down."[3]

¶ 176    The running theme there is a scheme or plan of some sort. And when we consider the word "design" in the overall context of section 111-4(c), that strikes us as spot-on. After all, that section does not allow for the joinder of just any group of offenses; it is limited to crimes that involve the deprivation of property or services through non-forceful means. See 725 ILCS 5/111-4(c) (West 2012). Sometimes those crimes are labeled "theft" and sometimes "fraud," both of which were charged in this case. But the reason those offenses may be joined into a single offense—thus raising the offense from multiple misdemeanors to a single felony or, as here,

---

[2] See, respectively, Merriam-Webster Online Dictionary, "Intention," at www.merriam-webster.com/dictionary/intention (site last visited April 8, 2021); www.merriam-webster.com/dictionary/intention#synonyms (site last visited April 8, 2021).

[3] See Merriam-Webster Online Dictionary, "Design," at www.merriam-webster.com/dictionary/design (site last visited April 8, 2021).

from lower-class felonies to a single felony of a higher class—is that they are linked by the single scheme the defendant employed to perpetrate each of these nonviolent crimes.

¶ 177   This reasoning squares with what guidance we glean from our supreme court's consideration of section 111-4(c). The first of those cases is *People v. Brenizer*, 111 Ill. 2d 220, 222 (1986), involving four charges of theft, each of which contained multiple, smaller instances of theft that were aggregated to raise each of the four theft charges from a misdemeanor to a Class 3 felony. The defendant was an employee at Bergner's department store with authority to make purchases on behalf of Bergner's at a discount food store. *Id*. at 221. The State alleged that, over the span of 2½ years, defendant abused that authority by (1) stealing over $800 in cash; (2) stealing food and general merchandise in excess of $300; (3) making unauthorized purchases at the store for items he converted to his personal use; and (4) charging back certain purchases so that Bergner's issued him reimbursement checks. *Id*. at 222.

¶ 178   The trial court dismissed the indictment, finding it unfair to join all the smaller, non-felony thefts into larger charges of felony theft. The supreme court reversed. In holding that it was proper for the State to merge multiple misdemeanor offenses of theft into single felony offenses under section 111-4(c), the court cited a decision from the New York Court of Appeals as follows:

> " 'Logic and reason join with all the authorities that have considered the question, in holding that the People may prosecute for a single crime a defendant who, pursuant to a single intent and *one general fraudulent plan*, steals in the aggregate as a felon and not as a petty thief. If this were not so, a crime of grand larceny would go unpunished and a felon escape because the law classified him only as a petty thief.' " (Emphasis added;

other emphasis removed.) *Id*. at 228 (quoting *People v. Cox*, 36 N.E.2d 84, 87 (N.Y. 1941)).

¶ 179   The court's emphasis there on a single fraudulent plan supports our interpretation that the phrase "in furtherance of a single *** design," in the context in which it appears under section 111-4(c), refers to a single scheme that unites all the individual merged offenses.

¶ 180   As does the decision in *People v. Rowell*, 229 Ill. 2d 82 (2008), where our supreme court held that the mere evidence of 15 distinct separate thefts by an employee from the store where he worked, without more, was insufficient to show a single intention and design. The trial was by stipulation, at which the evidence showed that defendant admitted to stealing 15 video games over the course of six weeks, as well as pocketing the sales proceeds of other merchandise he sold to customers, because he needed money. *Id*. at 87. But he was not charged for the money he pocketed; he was charged only for stealing the 15 video games that he took home. With regard to those video games, defendant admitted "that he would just take a game he wanted ***." *Id*. at 88.

¶ 181   On appeal from his conviction for felony retail theft, the defendant argued that his 15 individual thefts were not in furtherance of a single intention and design but, rather, were 15 "individual impulses to steal Xbox [video] games." *Id*. at 99. Our supreme court agreed and reversed the conviction outright. The court found that the State failed to prove a single intention and design, proving instead only that "defendant stole 15 Xbox video games for himself, and that he would just take a game that he wanted." *Id*. at 100.

¶ 182   In other words, absent any other proof as to the defendant's state of mind or the existence of some plan, Rowell's series of impulsive thefts were just that—a series of impulsive thefts without an overarching plan or "design." *Rowell* only underscores our view that the phrase

"single *** design" must mean some kind of scheme or plan that unites the individual acts of theft, as opposed to a mere series of thefts or takings that are the product of individual impulses.

¶ 183   To put this all together, the phrase "in furtherance of a single intention and design" under section 111-4(c) must mean two or more acts undertaken to further (1) a single intent to steal or defraud and (2) employing a single scheme or plan throughout, no matter the number of different victims.

¶ 184   With that in mind, a jury could have reasonably found that defendant's actions fell within this language. That is, the jury could have found that defendant acted with the singular intent to exert unauthorized and permanent control of houses that did not belong to him and doing so via a single fraudulent scheme—claiming an unfounded right of adverse possession and filing bogus papers with the Recorder of Deeds accordingly.

¶ 185   We begin with the "single intention" prong. Defendant argues, on the one hand, that no evidence of defendant's mental state was introduced; on the other, he claims that to the extent that various motives could be attributed to defendant—a protest against the banks, a desire to "homestead," a desire to put a roof over his head, a desire to profit by renting out these homes to families—they are just that, *multiple* intentions, not a single one.

¶ 186   We cannot agree with either claim. For one thing, one's mental state or intent is rarely susceptible of direct proof; the trier of fact may rely on circumstantial evidence of intent. *People v. Robinson*, 167 Ill. 2d 397, 408 (1995). The State here was not required to directly prove defendant's intent (though, as we will explain, a jury could have found that it did so).

¶ 187   As for defendant's various reasons for committing these crimes, defendant is blurring the clear distinction in the law between intent and motive. The State will often try to show a defendant's motive for committing a crime and is entitled to do so, as it tends to make it more

believable that a defendant committed an intentional act. *People v. Johnson*, 368 Ill. App. 3d 1146, 1157 (2006); *People v. Hale*, 326 Ill. App. 3d 455, 466 (2001); see *People v. Durkin*, 330 Ill. 394, 404, 405 (1928) ("the presence of a motive which would lead the accused to commit the act charged is always important in the consideration of the question whether the act done was done with criminal intent.").

¶ 188   But it is critical to distinguish between elements the State was required to prove and other evidence it may introduce to support proof of those elements. Proof of a "single intention" was required here. Motive was not.  The reason or reasons *why* defendant committed these crimes was not something the State was required to prove. It makes no difference whether he exerted unauthorized control over these properties because he was protesting the state of foreclosures in this country, because he wanted one of the houses for his own use, because he wanted to profit by renting out these properties to individuals and families—or any combination thereof.

¶ 189   To convict defendant of the thefts and aggregate the values of the properties under the joinder statute, the State was required to prove that defendant acted with the single intention to exert unauthorized control over these properties and permanently deprive the true owners of the beneficial use of the properties. 725 ILCS 5/111-4(c) (West 2014); 720 ILCS 5/16-1(a)(1)(A) (West 2014). The State more than sufficiently did so.

¶ 190   Indeed, when viewing this element properly and not looking under the hood for the motive or reasons for his actions, the evidence of defendant's intent was overwhelming. For one thing, defendant filed papers with the Recorder of Deeds claiming a right to these properties, the very purpose of which was to exert control over the properties and deprive the owners of their beneficial use. When questioned by Detective Purdy, defendant admitted that he had taken

possession of the properties. Nor did defendant, at any point during the trial, make any effort to deny as much.

¶ 191   Defendant's statement to Detective Purdy, and his theory at trial, was not a denial that he took over these properties, nor a denial that he intended to keep them permanently, but rather a claim that his actions were not "unauthorized" because he obtained them legally via adverse possession. That was certainly an available theory, but the jury was not required to accept it. The jury could have reasonably found, instead, that defendant knew what he was doing was illegal, and that he intended to use the law of adverse possession and a series of bogus documents as a ruse to fleece owners out of their property without their knowledge, much less their consent.

¶ 192   The proof of a "single design" was likewise ample and, indeed, uncontested. When defendant endeavored to steal each of the five parcels of property at issue in this case, he did so by following an identical scheme. In each instance, defendant (1) filed the same set of patently fraudulent documents with the Recorder's Office; (2) removed exterior locks, For Sale signs, and/or realtor-installed lockboxes from doors to gain entry; and (3) installed his own (ironic) "No Trespassing" sign on the property. A jury easily could have concluded that defendant's actions were pursuant to a "single design."

¶ 193   Defendant responds that we are being too liberal in our reading of the phrase "single intention and design" in the joinder statute and that, by such a broad interpretation, the State could charge virtually any series of thefts as one offense with the value of the properties aggregated, turning misdemeanors or low-level felonies into far greater offenses. Your garden-variety pickpocket, for example, who walks through a crowded bus and slips his hand into the pockets and purses of the passengers, stealing small amounts of money from a dozen people,

would find his thefts of $20 from this person, $50 from that one, $10 from another, suddenly aggregated into a higher-class offense, with higher penalties.

¶ 194    To that point, we have several responses. First, our duty is to follow the plain language of the statute, which we have done here. It is not our province to comment on the wisdom of the legislature's choices. We are not allowed to decide that a statute is written too broadly for our liking, and thus we must clip its edges. Second, there is no claim here of overbreadth or other constitutional defect, so we need not consider it.

¶ 195    Third, even if the pickpocket example were valid—if a series of pickpocket thefts on a bus could be construed as part of one single scheme or plan, a question we obviously need not decide—the General Assembly would certainly be within its prerogative to decide that a serial misdemeanant's actions should be punished as a single felony to deter those misdemeanor acts.

¶ 196    And finally, we would challenge the premise of defendant's argument to some extent. Yes, in some sense, this language appears quite broad. But we must keep in mind, first, that section 111-4(c) applies not to all crimes but only to a limited segment of crimes that relate to theft or fraud—non-forcible crimes that often (though not always) involve a fraudulent scheme. That, alone, narrows its scope. Second, the requirement is both of a single intention and a single design, which again narrows its breadth.

¶ 197    And third and perhaps most importantly, intent is the highest level of mental state known to the law, and here it heightened the State's burden beyond that which it otherwise would have borne. The crime of theft, for example, requires a "knowing[]" violation (along with, in this case, an intent to permanently deprive one of his property). 720 ILCS 5/16-1(a) (West 2014). The crime of financial institutions fraud requires proof that the defendant "knowingly" executed or attempted to execute a scheme to defraud. 720 ILS 5/17-10.6(c) (West 2014). Likewise,

committing a continuing financial crimes enterprise requires a "knowing[]" violation. *Id*. § (h).

So at least we can say that, in permitting the aggregation of these offenses and property values to

bump the crime up to a higher class of felony, the legislature likewise bumped up the State's

burden of proof. See *Brenizer*, 111 Ill. 2d at 228 (noting State's "added burden" of proving

single intention and design as precondition to using section 111-4(c)).

¶ 198   We likewise reject defendant's suggestion that the evidence was insufficient because not

all of the properties entered foreclosure or became vacant at the same time, and the thefts were

spread out over time. Section 111-4(c) contains no temporal requirement, no specification that

the acts must be committed simultaneously or close in time. The unifying link between these

crimes (other than the "intention" to steal or defraud) is not an element of time or proximity but

the employment of a single design—a single scheme.

¶ 199   Indeed, the amount of time over which defendant perpetrated his crimes here (September

2012 to May 2015) is not materially longer than the span of time over which the defendant

committed his thefts (2½ years) in *Brenizer*, 111 Ill. 2d at 222. The court in *Brenizer* relied

favorably on its earlier decision in *Woods v. People*, 222 Ill. 293, 297 (1906), where the

defendant stole gas from the gas company's pipeline over a period of 22 months (March 1903 to

December 1904). See *Brenizer*, 111 Ill. 2d at 227. Though the court in *Brenizer* recognized that

the siphoning of gas in *Woods* "may have been more in the nature of a continuous taking" (*id.*)

than the periodic but repeated thefts committed by Brenizer, our supreme court nevertheless

found that the value of the property and money stolen by Brenizer could be aggregated as long as

the State could prove a single intention and design (as well as other elements no longer required

to be proven under section 111-4(c)). *Id*. at 227-28.

¶ 200    Finally, defendant relies heavily on our supreme court's decision in *Rowell*, 229 Ill. 2d 82, discussed above. We find it distinguishable, first, for the reason we have already noted: that case did not involve any kind of coordinated scheme; for all the State proved at the stipulated trial, defendant was merely stealing video games impulsively when he found ones he liked, not as part of some preconceived plot or scheme. *Id*. at 100.

¶ 201    And the reason the proof of Rowell's mental state was so deficient was probably because the notion of the State bearing the burden of proving a "single intention and design" was completely absent from the case. That is, the information under which defendant was charged did not cite section 111-4(c) or mention the phrase "single intention and design;" the State never mentioned that element at trial; the defense was never put on notice that it was even an element against which it had to defend; and the court never mentioned it when rendering its verdict. *Id*. at 85, 95-96. The entire concept of "single intention and design" was a phantom element throughout the trial. So *Rowell* does not compel a different result here. (We acknowledge that the jury was not instructed on this element here, either; that is a claim of trial error we will discuss later; but the proof of single intention and design was far greater here than in *Rowell*, and defendant here at least knew he was being charged with a single intention and design.)

¶ 202    Based on all we have said above, taken in the light most favorable to the State and putting aside any claimed trial errors as we must, the jury had more than sufficient proof that defendant's actions were in furtherance of a single intention and design.

¶ 203                                    2. Lack of Criminal Intent

¶ 204    Defendant next argues that the State failed to prove that defendant acted with criminal intent to deprive the owners of their properties, as opposed to a good-faith belief that his possession of these five properties was valid under the doctrine of adverse possession. He says

he believed the properties were abandoned and that he was following the necessary process of obtaining the properties through adverse possession.

¶ 205    As noted, to prove defendant guilty of theft, the State had to prove that defendant (1) "knowingly *** obtain[ed] or exert[ed] unauthorized control over property of the owner" and (2) "intend[ed] to permanently deprive the owner of the use or benefit of the property." 720 ILCS 5/16-1 (West). Evidence of intent to permanently deprive the owner of property is usually circumstantial, including inferences drawn from the facts and circumstances as well as "the act of theft itself." *People v. Kotero*, 2012 IL App (1st) 100951, ¶ 31. A jury may also infer a defendant's intent "from fraudulent or deceptive acts that facilitated the theft." *Id*.

¶ 206    To be sure, "[a] *bona fide* belief, even though mistakenly held, that one has a right or claim to another's property, can negate an intent to permanently deprive the owner of his property." *People v. Baum*, 219 Ill. App. 3d 199, 201–02 (1991). But that is for the trier of fact to decide. See *People v. Winters,* 151 Ill. App. 3d 402, 406 (1986). And as noted, we will not disturb that finding if a rational jury, construing the evidence in the light most favorable to the State, could have made such a finding. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Cunningham*, 212 Ill.2d 274, 278 (2004).

¶ 207    Briefly, there are two ways a claimant may establish title to property through adverse possession. Under the first approach, "the claimant must prove possession of a property for a 20-year period and the 'possession must have been (1) continuous; (2) hostile or adverse; (3) actual; (4) open, notorious, and exclusive; and (5) under claim of title inconsistent with that of the true owner.' " *People v. Brown*, 2017 IL App (1st) 142877, ¶ 41 (quoting *Brandhorst v. Johnson*, 2014 IL App (4th) 130923, ¶ 37); see 735 ILCS 5/13-101 (West 2012). Under the second approach, "a claimant can show actual and adverse possession of lands for seven years,

contemporaneously with paying taxes under color of title." *Brown*, 2017 IL App (1st) 142877, ¶ 41; see 735 ILCS 5/13-109 (West 2012); 735 ILCS 5/13-110 (West 2012).

¶ 208   Against that legal backdrop, a reasonable jury could have easily discredited defendant's claim that he was merely attempting to engage in *bona fide* acquisitions of the properties via adverse possession. True, the jury did hear defendant try to elicit testimony, through his cross-examinations, that he possessed the properties openly, and his possession was clearly hostile and adverse to the interests of the true owners' interests. But the jury also heard extensive testimony from which a rational juror could have easily concluded that defendant's claimed intent to adversely possess the properties was actually a "ruse," and that his "true intentions were to steal" the properties at issue in this case. *Brown*, 2017 IL App (1st) 142877, ¶ 43.

¶ 209   To begin, defendant's adverse possession defense was closely tied to his purported belief that the properties he was trying to take were vacant and abandoned. Even giving defendant the benefit of the doubt that the properties were vacant, his claim that they were abandoned bordered on the ludicrous. As multiple witnesses testified, the properties at issue in this case had "For Sale" signs posted. The right to alienate—that is, to sell or otherwise convey—one's property is one of the primary rights of an owner. *Department of Transportation v. Anderson*, 384 Ill. App. 3d 309, 312 (2008). Evidence that a property is for sale is thus powerful proof that the property has *not* been abandoned, regardless of whether anyone currently resides there.

¶ 210   And the evidence showed that someone had broken into the properties and removed and changed the locks, further evidence undermining defendant's claim. See *Brown*, 2017 IL App (1st) 142877, ¶ 43 (reasonable jury could have disbelieved defendant's claim that he merely intended to adversely possess, not steal, home when evidence showed that defendant broke into home's garage using crowbar). Add to that Thomas's testimony that she personally told

defendant his adverse possession filings were legally deficient—coupled with defendant's dismissive wave-off of her advice and the facially improper nature of the documents that defendant filed at the Recorder's Office—and the jury easily could have rejected defendant's claim that he was merely trying in good faith to adversely possess the properties.

¶ 211   We thus find no merit to the claim that the State failed to prove criminal intent to permanently deprive the owners of their property.

¶ 212                               3. Proof of Property Values

¶ 213   Next, defendant claims that the State failed to prove him guilty beyond a reasonable doubt because it did not prove that the total value of the properties he stole exceeded $1 million as required to sustain the Class X conviction for felony theft. We again employ the *Jackson* standard and ask whether, viewing the evidence in the light most favorable to the State, a rational jury could have found this element satisfied beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Cunningham*, 212 Ill. 2d at 278.

¶ 214   The value of stolen property is the fair cash market value at the time and place of the theft. *People v. Perry*, 224 Ill.2d 312, 336 (2007). "The opinion testimony of one who has sufficient knowledge of the property and its value to give a reasonable estimate, received without objection, is sufficient, in the absence of contrary evidence, to establish value." *People v. Harden*, 42 Ill. 2d 301, 305–06 (1969). "[T]he State need not prove the exact dollar value of the property taken in a theft" but "need only establish that the fair cash market value of the property at the time of the theft exceeds" the threshold required under the statute. *People v. Davis*, 132 Ill. App. 3d 199, 203 (1985).

¶ 215   Here, that monetary threshold, putting together the five properties taken, was $1 million in fair market value. The State says it proved that the collective value of the properties exceeded

that value: $164,000 (South Esmond) + $191,400 (South Wood) + $675,000 (West Rosemont) + $190,000 (South Indiana) + $140,000 (South Greenwood) = $1,360,000.

¶ 216   At the outset, the State claims that defendant is not attacking the sufficiency of the proof but the foundation for the State's opinion testimony—an objection he forfeited by failing to raise it at trial. To the extent that his arguments relate to the qualifications of a witness or the assumptions on which a witness testified, we agree that he forfeited any such foundational objections. But we do not take his arguments as such. We agree with defendant that he is challenging the sufficiency of the proof, which is not subject to forfeiture.

¶ 217   We first consider defendant's argument, applicable to each property, that "[a]t most, the value of the theft" he committed "was the value of the occupancy of the properties," which the State failed to prove. This argument is predicated on a misapplication of our supreme court's opinion in *Perry*, 224 Ill. 2d 312, where defendant was charged with theft by deception after running up $15,000 in unpaid charges during a multi-month stay at a hotel. At issue there was (1) whether the defendant's occupancy of the hotel room constituted "property" under the Criminal Code and (2) whether the defendant's occupancy of the hotel room permanently deprived the owner of the beneficial use of its property. The court answered both questions affirmatively. See *id*. at 334-36.

¶ 218   We can pause our recitation of *Perry* there, because the basic facts of that case are miles away from what happened here. In *Perry*, the defendant stole a hotel room, so by definition, any loss the hotel suffered had to be pegged to the room's rental rate. Every day the defendant failed to pay rent was a day the hotel could have rented the room to a paying customer, so the analysis was straightforward: Rental rate multiplied by days occupied equals value of the theft. In our case, by contrast, the property owners were not renting out the homes; they were trying to sell

them. This argument might hold water if defendant moved into a rental apartment and stiffed the landlord, but that is clearly not what happened. *Perry* is not remotely on point.

¶ 219   We should also address another theme running through all of defendant's attacks on the market value testimony. He argues that recent sales of those properties (recent, that is, to the time of the theft) are inadequate proof of their fair market value in and of themselves. He does so by referring to these recent sales of these properties as their "*cost* at the sale" (emphasis ours) and then quotes a 1958 decision of our supreme court for the proposition that "proof of cost alone does not establish the fair cash market value at the time and place of the receipt of the property," even if "that cost, together with other proof, may afford the basis for a valid finding as to value." *People v. Todaro*, 14 Ill. 2d 594, 601 (1958).

¶ 220   The supreme court's quotation is indisputably correct, but defendant's attempt to shoehorn the sales of these homes into that doctrine is not. The recent sales price of a home is not its "cost"—not to the owner/seller of the property, at least. The term "cost" refers to how much the owner paid for the property initially, as opposed to what it would be worth on the open market at any given time. For example, in *Todaro*, the defendant stole over 200 bottles of liquor. *Id*. at 595. The owner paid nearly $600 for that liquor. That was the owner's cost. *Id*. at 601. That, alone, would not have been enough to establish fair market value—what those bottles could fetch on the open market—but in that case, the State presented other evidence or market value to prove the minimum threshold for theft.

¶ 221   Far from being an inadequate measure of a property's fair market value, a recent arms-length sale of the property is, by definition, about the best evidence anyone could ever provide of a property's fair market value—it is not some theoretical estimate but proof that a neutral buyer actually paid a certain price for that property on the open market. See, *e.g.*, *Gateway-Walden,*

*LLC, v. Pappas*, 2018 IL App (1st) 162714, ¶ 33; *Kraft Foods, Inc. v. Illinois Property Tax Appeal Board*, 2013 IL App (2d) 121031, ¶ 43.

¶ 222 That is not to say that defendant could not poke holes in this evidence, and he attempts to do so, as we will discuss below. But generally speaking, we reject the notion that a reasonable juror could not rely on proof of a recent sale of the property as proof of its fair market value.

¶ 223 Defendant lodges two attacks on the State's evidence concerning the value of the Rosemont Avenue Property. First, he contends that Fitzpatrick's testimony that the property sold for "about 675 [thousand], somewhere," shows that "she was uncertain about the sale price of the home." To be sure, Fitzpatrick's equivocation gives us some pause. But the equivocation was minor—she gave a specific number, not a broad price range, so any invitation for speculation was minimal. And defendant did not cross-examine Fitzpatrick on this point.

¶ 224 As we have already noted, "[t]he opinion testimony of one who has sufficient knowledge of the property and its value to give a reasonable estimate, received without objection, is sufficient, in the absence of contrary evidence, to establish value." *Harden*, 42 Ill. 2d at 305-06. Accepting defendant's characterization of Fitzpatrick's testimony, that describes our situation: Fitzpatrick had knowledge of the property and its value, and she at worst gave a "reasonable estimate" of its value that was "received without objection" and not tested through cross-examination. It was sufficient.

¶ 225 Second, defendant claims that Fitzpatrick's testimony was insufficient because she testified to what property was worth when it was sold in April 2015, not what it was worth when defendant occupied around October 2014. We disagree on this point as well.

¶ 226 Fitzpatrick testified that before defendant's occupation of the Rosemont Avenue Property, it was listed for sale in June 2014 for $729,000 (defendant's occupation began sometime thereafter and ended on October 29, 2014). The listing price, alone, is at least probative, if not necessarily conclusive, evidence of the property's value. See *United States v.*

*Bryson*, 94 Fed. Appx. 389, 392 (7th Cir. 2004) ("The listing price and any recent sales are key factors an appraiser uses to determine the fair market value of a property."); *State v. Dixon*, 947 N.W.2d 563, 577 (Neb. 2020) ("It seems obvious that the price at which an item is offered for sale generally reflects the seller's opinion of the item's market value, and while that is certainly not conclusive evidence of the item's market value, it is nevertheless relevant evidence.").

¶ 227   As stated, the Rosemont Avenue Property sold in April 2015 for $675,000. At trial, neither party introduced any evidence directly showing, or from which the jury could have inferred, that the conditions in the real estate market for the neighborhood where the Rosemont Avenue Property was located appreciably changed between October 2014 and April 2015. A reasonable jury thus could have taken $675,000 as a reasonable estimate of the fair market value of the property at the time of the theft.

¶ 228   Defendant's citation to *People v. Castro*, 109 Ill. App. 3d 561 (1982), does not convince us otherwise. Castro was convicted of felony theft of property in excess of $150 after he stole a snowblower from a store. The store owner testified that (1) he bought the snowblower used for $300 at least five years earlier, (2) the snowblower currently had a broken handle, and (3) the snowblower would "probably" cost $600 new. *Id*. at 563.

¶ 229   We reversed the conviction, as neither the cost nor the replacement cost was the proper standard—the State had to prove the fair market value at the time of the theft. *Id*. at 569-70. The proof was insufficient because (1) "the record disclose[d] that the snowblower was used for five years subsequent to purchase and had a broken handle[]" and (2) "none of the questions propounded to the complainant related to fair cash market value, but instead concerned the actual price paid and speculation as to its retail value if purchased new five years earlier." *Id*. at 568-69.

¶ 230   Here, in contrast, the State presented at least a rough approximation of the property's fair market value in June 2014 ($729,000) and in April 2015 ($675,000). And again, this evidence of fair market value was not the "cost" of this property as that term should be understood in this context. *Castro* is distinguishable.

¶ 231   Next, defendant argues that the State failed to prove the fair market values of the Wood Street, Esmond Street, Rosemont Avenue, and Indiana Avenue properties because it only introduced evidence of their recent sales prices without also showing that these sales occurred in arms-length transactions.

¶ 232   Dominguez testified that the Esmond property sold for $164,000 in June 2015. Thouvenell testified that the Wood property sold in December 2015 for $191,477. Conatser testified that the Indiana property sold in May 2016 for $190,000. It is true that there was no evidence as to whether those sales took place in arms-length transactions, which would have been preferable. See *Pappas*, 2018 IL App (1st) 162714, ¶ 33. But there is no debating that the sales prices these properties fetched were, at a minimum, competent evidence of their fair market value at that time, and sufficiently close in time to the thefts to support evidence of their fair market value at the time of the theft. And defendant was free to challenge the neutrality of these sales transactions but did not. Absent any challenge to this evidence, the trier of fact was within its province to rely on it. *Harden*, 42 Ill. 2d at 305-06.

¶ 233   The constitution does not require the State to introduce the best evidence or turn over every evidentiary stone—it requires sufficient evidence for a rational juror to find that the State has proven each element beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; see *Curtis v. Montgomery*, 552 F.3d 578, 581 (7th Cir. 2009) ("*Jackson* requires that the prosecution put forward *enough evidence* of each element of the offense that a rational fact finder could find the

defendant guilty beyond a reasonable doubt." (Emphasis added.)). With regard to four of the five properties, at least, the State did so here.

¶ 234    The valuation of the fifth property, the Greenwood property, is more problematic in that the only evidence given was the property's listing price. Leon Ivy testified that the Greenwood property was listed for sale at $140,000 and eventually sold. The sales amount was not mentioned. As we have noted, the listing price is relevant evidence of a property's fair market value, as it demonstrates some considered estimate of what an owner believes it can get on the open market for a property. See *Bryson*, 94 Fed. Appx. at 392; *Dixon*, 947 N.W.2d at 577. But standing alone, the listing price is likely insufficient to establish fair market value. See *Farr West Investments v. Topaz Marketing L.P.*, 220 P.3d 1091, 1095 (Id. 2009) (listing price "is not substantial and competent evidence of [property's] fair market value."); *Reed v. Reed*, 763 N.W.2d 686, 696 (Neb. 2009) (same).

¶ 235    But as the State notes, even if we put aside the Greenwood property altogether, the four other properties were valued collectively at more than $1.2 million. We thus find that a rational juror could have found beyond a reasonable doubt that the fair market value of these four properties exceeded $1 million.

¶ 236    Because we have concluded that the evidence was sufficient to support defendant's convictions, a retrial would not violate double jeopardy.

¶ 237                                    III. Instructional Error

¶ 238    Finally, defendant argues that he was denied a fair trial because the jury did not receive an instruction on the element of single intention and design. Because we are reversing based on inadequate Rule 401(a) admonishments, it is an issue we need not consider. But in light of our remand for retrial, we would note that defendant is correct that the trial court must instruct the

jury on the elements of the charged offense. *People v. Ayoubi*, 2020 IL App (1st) 180518, ¶ 53; *People v. Fonder*, 2013 IL App (3d) 120178, ¶ 22. And as noted earlier, proof that defendant's individual acts of theft were in furtherance of a single intention and design is an element of the offense and thus required a jury instruction. *Rowell*, 229 Ill. 2d at 101; *Walton*, 2013 IL App (3d) 110630, ¶ 23. If the State again charges these multiple thefts as single offense under section 111-4(c), a jury instruction on this element is required.

¶ 239                                    CONCLUSION

¶ 240   We reverse defendant's conviction and remand for a new trial.

¶ 241   Reversed and remanded.

**No. 1-17-2811**

| | |
|---|---|
| **Cite as:** | *People v. Moore*, 2021 IL App (1st) 172811 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 15-CR-11378; the Hon. Alfredo Maldonado, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, Drew A. Wallenstein, and Jonathan Krieger, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Jon Walters, and Paul Colin Kiefer, Assistant State's Attorneys, of counsel), for the People. |